226 P.3d 66 (2010)
233 Or. App. 360
In the Matter of A.B., a Minor Child.
State ex rel. Juvenile Department of Washington County, Respondent,
v.
L.B. and N.A.M., Appellants.
01J070628; A138333.
Court of Appeals of Oregon.
Argued and Submitted November 12, 2009.
Decided January 27, 2010.
*67 Susan D. Isaacs, Beaverton, argued the cause and filed the brief for appellant N.A.M.
Richard D. Cohen, Portland, argued the cause and filed the brief for appellant L.B.
Patrick M. Ebbett, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.
Before WOLLHEIM, Presiding Judge, and BREWER, Chief Judge, and DEITS, Senior Judge.[*]
WOLLHEIM, P.J.
Mother and father appeal a juvenile court judgment that established dependency jurisdiction over their two-month-old child. The court took jurisdiction on the ground that conditions and circumstanceswhich produced a serious unexplained injury to child's legendangered her welfare. The court later dismissed jurisdiction, but mother and father contend that the court never should have asserted jurisdiction in the first place. The Department of Human Services (DHS) responds that the case is now moot, but that the court properly asserted jurisdiction over child. We agree with father and mother that the case is not moot, given the collateral consequences of the court's judgment *68 asserting jurisdiction, but we agree with DHS that that judgment should be affirmed.
We begin with the question of justiciability. The juvenile court took jurisdiction over child in February 2008, and mother and father appealed. In June 2008, the juvenile court dismissed the case, on the ground that "reasonable * * * efforts, in light of [child's] and [her parents'] circumstances, have been made to prevent or eliminate the need for removal of the [child] from the home and to make it possible for [child] to safely return home * * *." Then, in August 2008, DHS moved to dismiss this appeal as moot, based on the June order dismissing the case. DHS argued that, because the case was ultimately dismissed, a decision regarding the earlier judgment asserting jurisdiction "would no longer have a practical effect on the rights of the appealing parties." See Corey v. DLCD, 344 Or. 457, 464, 184 P.3d 1109 (2008) ("If it becomes clear in the course of a judicial proceeding that resolving the merits of a claim will have no practical effect on the rights of the parties, this court will dismiss the claim as moot."); Yancy v. Shatzer, 337 Or. 345, 349, 97 P.3d 1161 (2004); Brumnett v. PSRB, 315 Or. 402, 405, 848 P.2d 1194 (1993) (a justiciable controversy exists when "the interests of the parties to the action are adverse" and "the court's decision in the matter will have some practical effect on the rights of the parties to the controversy").
Mother and father opposed DHS's motion to dismiss, contending that "the jurisdictional finding of the Court remains a matter of record." They argued, among other things, that father has suffered and will continue to suffer adverse employment consequences as a result of the finding of jurisdiction; that mother and father would be restricted in their involvement in child's life as far as activities at school, such as accompanying child on field trips; and that the jurisdictional finding and underlying DHS administrative findings would be used against them if there were any need in the future for DHS to intervene.
The Appellate Commissioner denied DHS's motion to dismiss on the ground that mother and father "have shown that there are collateral consequences to the trial court's determination that the petition invoking the juvenile court's jurisdiction was well-taken." DHS sought reconsideration of the Appellate Commissioner's order, and, on reconsideration, the Chief Judge adhered to the Appellate Commissioner's order:
"Upon review, it is clear the original order was correct. [Mother and father] have demonstrated collateral consequences to the juvenile court's judgment that are significant in number and scope. In light of those consequences, a decision from this court will continue to have a practical effect and, for that reason, the case is not moot."
In response to mother's and father's opening briefs, DHS renewed its arguments regarding mootness, and, following oral argument, this court allowed mother and father to supplement the record with further evidence and argument as to why this case still presents a live controversy. For the reasons that follow, we agree with the previous orders in this case determining that the case is not moot.
In an affidavit submitted to this court, father avers that he has suffered adverse employment consequences as a result of the judgment taking jurisdiction over child. Father is a project manager who works with corporations that contract with the federal government. Those contracts, father states, require him to obtain high level security clearances. Before the juvenile court took jurisdiction in this case, father had never failed a security clearance. However, father has since failed a security clearance for a corporation for whom he has worked on previous occasions. According to father, the juvenile court's assertion of jurisdiction is the "only incident or involvement in which I have been entangled that could conceivably or possibly have any impact on my denial of security clearance"; father contacted someone "affiliated with" that corporation and was informed that "child abusers don't receive the highest level of security clearances." Father's affidavit, though not as detailed as it could be, nevertheless gives rise to reasonable inferences that the juvenile court's initial judgment has hadand will continue to *69 havecollateral effects on father's employment prospects.
What is equallyperhaps, moresignificant is the effect that the juvenile court's judgment continues to have with respect to any future investigation of child's circumstances or those of mother or father. In the event that DHS were to receive a report of child abuse, the department would be required by statute to "[c]ause an investigation to be made to determine the nature and cause of the abuse of the child[.]" ORS 419B.020(1)(a). In conducting that investigation, Child Protective Services (CPS) reviews "historical information on the family and the child that may be useful in completing the CPS assessment." OAR XXX-XXX-XXXX(1)(a)(B). That includes a review of any "[h]istory or a pattern of abuse or neglect," OAR XXX-XXX-XXXX(1)(b)(B), which would include any previous "founded" abuse disposition.
Father and mother contend that, unless this court reverses the juvenile court's order asserting jurisdiction in this case, they have no way of challenging the underlying administrative findings by DHS. That appears to be the case. Under DHS's own rules, the agency will not review a "CPS founded disposition" if the juvenile court's findings are consistent with the founded disposition. See, e.g., OAR XXX-XXX-XXXX ("If a requestor inquires about a review of a CPS founded disposition and there is a legal finding consistent with the CPS founded disposition, the local Child Welfare office staff must prepare and deliver a `Notice of Legal Finding' (Form CF 318) that informs the requestor that the Department will not review the disposition."). Here, the juvenile court found that child sustained serious, unexplained injuries and that child was endangered by conditions and circumstances in the parents' home. Although the juvenile court later dismissed jurisdiction on the ground that the conditions and circumstances no longer endangered child, the court did not disturb the findings in its previous judgment asserting jurisdiction. Thus, the juvenile court's judgment asserting jurisdiction, as well as any concomitant DHS findings regarding abuse or neglect, negatively affect father's and mother's record with the department.
Finally, mother and father contend that they have suffered and will suffer a social stigma associated with having their child removed from their care based on allegations of abuse or neglect. Cf. State v. E.A.L., 179 Or.App. 553, 556, 41 P.3d 440 (2002) (holding that an appeal of an order committing an accused mentally ill person is not moot after the period of confinement, because of the "undeniable" stigma associated with mental commitment). Although that stigma alone might not create a justiciable case in every circumstance (particularly in light of the confidentiality of DHS and juvenile court records), we nonetheless agree with mother and father that, when coupled with the derogatory "abuse history" with the department and the likelihood that the juvenile court's order will continue to affect father's future security clearances and employment opportunities, the order asserting jurisdiction continues to have sufficient collateral, practical effects that make this a live controversy. For that reason, we reject DHS's renewed arguments that this case is moot.
We turn to the merits of the appeal. Mother's and father's assignments of error present this overarching issue: Whether the juvenile court erred in exercising jurisdiction over child based on its finding that child suffered a serious physical injury that was inadequately explained by her parents. We review the facts in this case de novo, ORS 419A.200(6)(b) (2007), amended by Or. Laws 2009, ch. 231, § 6,[1] but give "considerable weight" to the juvenile court's findings based on credibility, in light of that court's ability to observe the witnesses and their demeanor. State ex rel. Juv. Dept. v. Geist, 310 Or. 176, 194, 796 P.2d 1193 (1990). "To the extent that a credibility determination is based on a comparison of the witness[es]' testimony with the substance of other evidence, this court is as well equipped as the trial court to make that credibility determination." *70 State ex rel. Juv. Dept. v. G.P., 131 Or.App. 313, 319, 884 P.2d 885 (1994).
Child was born on September 2, 2007. Although child was a colicky newborn, her physician noted nothing out of the ordinary during her two-month pediatric appointment. Child's colic seemed to be improving after her appointment on November 2, 2007, when she was prescribed new medicine, and child generally cried less between November 2 and November 7. However, on November 7, 2007, the parents noticed that child was moving differently in her crib; she was also fussy that night, crying from midnight to 4:00 a.m. Four days later, on November 11, mother and father called child's doctor because child had "started radically sobbing early that morning, around 10:00." The on-call pediatrician, Dr. Crowley, instructed the parents to take child to the hospital emergency room to determine whether she was suffering from a bowel obstruction.
By the time the family reached the hospital, Crowley had spoken to Hull, an emergency room pediatrician, and reported child's symptoms. Two nurses observed child while father was holding her, and Dr. Yarris, a resident who was working with Hull, was the first physician to examine her. When Yarris laid child on her back, she began crying; Yarris then conducted a full-body examination and presented the case to Hull. Hull noted that child was not moving her right leg as much as her left.
After a full examination of child, Hull believed that child was injured at her right femur (thigh bone) at the knee, and he ordered an x-ray of child's pelvis and right leg. The x-ray of the right leg showed a femur fracture, sometimes called a "bucket handle fracture." Fractures of that kind are caused by rotational or sideways force across the ligaments that stabilize the knee. In infants and young children, the ligaments are stronger than the bone, so that when force is applied to the ligament, the ligament can pull off a chip of the bone. If the force is sufficiently strong or sustained, the pressure will continue across the femur and result in a "bucket handle fracture" like that suffered by child.
After Hull initially diagnosed the fracture, he asked child's parents for an explanation regarding possible causes of the fracture, asking questions like, "Is there any history of any kind of injury to the baby's leg." Mother and father said that there was no such history. After the x-ray confirmed his initial diagnosis, Hull again approached parents about the injury. Both parents told Hull that there was no possibility of nonaccidental or accidental trauma, that they did not use a babysitter, and that child was never left alone. Hull tried to "jog their memory" with questions about a history of falls, child getting her leg caught in the crib, or child rolling off a changing table and someone grabbing her. Parents responded "no" to each of the scenarios presented by Hull. Parents did, however, offer the observation that child had been "scooting more around the crib" in something of a circle, which caused Hull to question the duration of the injury. Father, meanwhile, insisted that the doctors were missing the more important issue of abdominal pain by focusing only on "an obvious thing like the femur[.]" Hull told father that the broken bone was a significant and extremely painful injury and was probably the reason that child did not want to be on her back.
Child's leg was placed in a splint, and child was transported by ambulance to another hospital for treatment and evaluation. During child's stay at that hospital, doctors, social workers, and law enforcement officials repeatedly questioned parents about possible explanations for the fracture. Detectives asked mother several times if child "had been dropped or fallen or rolled off of furniture or anything at all along those lines," and mother replied that it "just * * * wasn't possible." Father was asked similar questions by Anderson, a detective assigned to the Child Abuse Team in the Washington County Sheriff's Office. Father told Anderson that "nothing like that had ever happened." According to Anderson, father was "more upset that his daughter might have an undiagnosed condition"; father told the detective that child's leg "wasn't really a big issue." Father also told one of child's treating physicians, Dr. Barmada, that father did not know how the injury could have occurred, and father *71 told Rogers, a social worker, that father had been "wracking my brain" but could not come up with any possible explanation for the injury.
Given the lack of any explanation for the serious injury, DHS decided to place child in protective custody, and mother and father were informed of that decision in a meeting at the hospital. During that meeting, mother turned to father and asked, "What about that time she started to fall," and asked father whether mother had grabbed child by the leg on that occasion. According to detective Anderson, father "immediately said no, dismissed it, and that was pretty much the end of that."
The following day, the juvenile court held a shelter hearing. At that hearing, mother for the first time provided a detailed explanation of the injury. Mother testified that she was sitting in a recliner at child's feeding time, and child was sitting in her lap. Mother testified that she took a moment to reply to an e-mail on her nearby laptop and felt child begin to fall; as child was falling, mother grabbed child's right leg with her left hand and grabbed child's waist with her right hand. According to mother, the fall had happened a few days before they had gone to the hospital, and child did not cry or give any indication that she was injured at that time.
Mother further testified that she had, in fact, mentioned the fall and right leg grab previously to Hull. According to mother, immediately after Hull asked her about child's injury, the "first thing" that she said to him was that child had fallen out of a chair and that she had grabbed child's leg. Mother testified that Hull quickly dismissed that explanation and did not ask for any details. Mother also testified that, during the previous night's meeting with the social worker and the detectives at the hospital, mother had started to offer that explanation but the social worker had cut her off.
At the jurisdictional hearing, mother again gave the same explanation for child's injurythat she grabbed child's right leg as child was falling from her lapand testified that she had not offered the explanation earlier because of the dismissive response from Hull. Although various doctors testified that mother's explanation could possibly explain the injury, Hull testified that he did not recall mother ever mentioning the fall to him, despite the fact that he had repeatedly pressed both parents for an explanation. Similarly, Anderson, who had followed up with Hull after the shelter hearing, testified that Hull flatly denied that mother had ever offered him that explanation.
Mother also again testified that Rogers, the social worker, had dismissed her explanation during their hospital meeting. However, both Rogers and detective Anderson, who was also at the meeting, testified that mother had simply asked father whether she had grabbed child by the leg, and fathernot Rogerssaid, "No, that's not it."
At the close of the jurisdictional hearing, the juvenile court asserted jurisdiction over child. The court relied heavily on Hull's testimony:
"Dr. Hull's testimony, in my opinion, was perhaps the most important because two things I infer from that particular visit with Dr. Hull.
"Firstly, I do find from Dr. Hull's testimony that he would have been particularly insistent with both mom and dad to understand the nature of the injury, and that's because Dr. Hull knew, as the parents later learned, that a referral to [the second hospital] really changed in a significant way the nature, degree of hospital and State involvement, and it's that critical juncture in which I really have no doubt in concluding that Dr. Hull was particularly insistent with mom and dad to be as explanatory as possible about providing him with any explanation about how the injury could have been suffered by [child].
"* * * * *
"From there, Dr. Hull testified that of course he was unable to determine what the particular cause of the injury would be. It could be, as we know, a rotational or sideways injury to the leg, but we do know that it could not have been caused by any reasonable caretaking. It could not have been caused by normal moving from the crib to a stroller or a car seat, or caused by normal childcare activities. As that goes, *72 it's important because we can only conclude, based on Dr. Hull and Dr. Skinner and Dr. Brady's testimony, that the injury must have been caused by some great force."
The court rejected mother and father's argument that it must find that the injury was nonaccidental or accompanied by other similarly unexplained injuries. Instead, the court focused on the totality of the circumstances surrounding the injury and explanation:
"I believe that's beside the point, in that an unexplained injury of significance, which results in a child's expression of pain, is such that the child is unable to obtain prompt, efficient medical treatment, is such that Juvenile Court jurisdiction must attach, such a significant injury that a parent or guardian's failure to recognize the injury, failure to address the injury could reasonably be an expectation of harm to the child.
"* * * * *
"* * * [u]nder these facts I think it reasonable to conclude, and the evidence certainly supports the inference that the injury occurred on Wednesday. That leads me to the conclusion that Thursday, Friday, Saturday, during normal childcare, the injury was not appropriately attended to.
"* * * * *
"* * * [T]he Court finds that jurisdiction was proven by the State by a preponderance of the evidence, that [child] suffered an unexplained injury that was significant and serious, that there was an insufficient explanation given, and that insufficient explanation requires the intervention and wardship of the Washington County Juvenile Court to supervise for her care, placement, and supervision."
The court then entered a judgment finding child within the jurisdiction of the juvenile court, which mother and father appeal.
On appeal, mother argues that the juvenile court erred in asserting jurisdiction over an unexplained injury because child was not, in fact, subjected to such an injury. According to mother, a preponderance of the evidence establishes that child suffered an explained, accidental injury, and that there is no variance between the injury and the explanation that mother offered. Father similarly argues that the injury was adequately explained. He also argues that, in any event, an "unexplained physical injury" is not sufficient to justify an assertion of juvenile court jurisdiction under ORS 419B.100 unless a preponderance of the evidence establishes that the injury was caused by abuse or was nonaccidental.
We begin with mother's and father's contentions that, contrary to the trial court's findings, child's injury was adequately explained. According to mother and father, mother's version of events regarding child's fall from her lap is consistent with the type of injury that child suffered, according to all the medical evidence in the record. The problem with mother's and father's arguments, however, is that they would require us to ignore the juvenile court's implicit credibility findings in this case. As discussed above, this court gives "considerable weight" to the juvenile court's findings on credibility, in light of that court's ability to observe the witnesses and their demeanor. Geist, 310 Or. at 194, 796 P.2d 1193. And here, after hearing and observing each of the witnesses and considering their sometimes conflicting testimony, the juvenile court implicitly found that mother's explanation of the injury lacked credibility.
On appeal, we will not disturb that implicit credibility finding, particularly in light of certain substantive parts of mother's testimony. We find it somewhat implausible, on this record, that Hull would have dismissed, without any discussion, mother's explanation that child fell and was grabbed by the right leg. By all accounts, Hull made repeated efforts to discover any possible cause of the injury. Moreover, given the severity of child's injury, the stakes of the investigation, and the repeated inquiries for any possible explanation, the lateness of mother's explanation raises serious questions regarding its accuracy, and we are not prepared to overturn the juvenile court's factual determinations in that regard.
Father's additional argumentthat an unexplained injury must be "abuse" or "non-accidental" *73 to warrant dependency jurisdictionlikewise fails. Contrary to father's suggestion, this is not a case in which the juvenile court asserted jurisdiction on the ground that mother or father "[s]ubjected the person to cruelty, depravity or unexplained physical injury," ORS 419B.100(1)(e)(C). Rather, the juvenile court asserted jurisdiction under ORS 419B.100(1)(c), which gives the juvenile court exclusive jurisdiction where child's "condition or circumstances are such as to endanger the welfare of the person or of others."[2]
As we explained in State ex rel. Juv. Dept. v. Vanbuskirk, 202 Or.App. 401, 405, 122 P.3d 116 (2005):
"The key inquiry in determining whether `condition or circumstances' warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child. It is the child's condition or circumstances that are the focus of the jurisdictional inquiry. In deciding if the juvenile court has jurisdiction, the court must determine if the child needs the court's protection, not the nature or extent of the necessary protection."
(Emphasis in original; citations omitted.) Here, the juvenile court examined the totality of the circumstances in this case and determined that child needed the court's protection. Those circumstances included the facts that child was two months old; child had suffered a serious, painful injury caused by rotational or sideways force; child had likely gone days without receiving medical attention for that injury;[3] neither parent, when initially asked for an explanation, provided one; and mother belatedly offered a plausible explanation but lied about having earlier provided that explanation to child's doctor. In our view, given the court's factual findings regarding the vulnerability of the child, the nature and severity of the injury, and the inadequacy of mother's and father's explanation, the juvenile court did not err in asserting jurisdiction in this case.
Affirmed.
NOTES
[*] Brewer, C. J., vice Edmonds, P. J.
[1] Those amendments, which apply to cases in which the notice of appeal was filed on or after June 4, 2009, are not applicable here.
[2] The state's petition, and the trial court's judgment, specifically reference ORS 419B.100(1)(c) as the basis for dependency jurisdiction in this case.
[3] The juvenile court found that the injury likely occurred as early as Wednesday, when child became fussier, and that finding is not challenged on appeal.