Argued and submitted February 3, on respondent's motion to dismiss filed July 6, and appellant's response to motion to dismiss filed July 13, motion to dismiss denied; affirmed August 18, 2010

In the Matter of R. T. S.,
a Child.

STATE OF OREGON,
*Petitioner-Respondent,*

*v.*

S. T. S.,
*Appellant.*

Jackson County Circuit Court
090315J; Petition Number 090315JA;
A143524 (Control)

In the Matter of K. R. S.,
a Child.

STATE OF OREGON,
*Petitioner-Respondent,*

*v.*

S. T. S.,
*Appellant.*

Jackson County Circuit Court
090380J; Petition Number 090380JA;
A143525

238 P3d 53

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

LANDAU, P. J.

In this juvenile dependency case, the state alleged that father's domestic violence against mother presented a reasonable likelihood of harm to the couple's two children, and the juvenile court took jurisdiction over both children as to father on that basis. Father challenges the court's finding of jurisdiction, arguing that the state failed to prove that his conduct presented a *current* risk of harm to either of the children. After the case was submitted to this court, the juvenile court dismissed jurisdiction, and Department of Human Services (DHS) now moves this court to dismiss father's appeal as moot. We agree with father that his appeal is not moot, although we agree with DHS that the juvenile court's finding of jurisdiction was appropriate. Accordingly, we deny DHS's motion to dismiss and affirm on the merits.

The relevant facts are undisputed. Mother and father met and began a romantic relationship in 2002; they lived together on and off for the next seven years. During the course of their relationship, they had frequent arguments and would sometimes separate for a period of time afterwards.

At various points, mother reported that father had been violent toward her. In November 2005, four months after the birth of their first child, mother attended a mental health assessment and reported to the assessing counselor that she had been in a "domestically violent situation" with father. In January 2008, mother applied for a domestic violence grant so that she could obtain independent housing; on her application, she represented that she had been in a domestic violence relationship for the previous six years. And, in December 2008, while mother was pregnant with their second child and receiving prenatal care, she reported that father was physically abusive and that he had hit her or kicked her in the previous two weeks. That same month, father threw a diaper bag at mother, which gave her a black eye.

In January 2009, a DHS caseworker scheduled an appointment with mother to investigate concerns about domestic violence between mother and father. Mother—who was in California but had planned to come back to Oregon for

the appointment—notified DHS that she would be staying in California indefinitely and would be unable to make the appointment. DHS closed the case as "unable to locate." Two months later, in March, mother moved back to Oregon and began living with father. In May, mother moved into father's parents' home, although father was not also living there at the time.

In June 2009, DHS learned that mother—still pregnant—had moved back to Oregon and again contacted her to investigate its concerns about domestic violence. At that point, mother told the caseworker about her high-conflict relationship with father; she said that, during their arguments, father would call her names, threaten her, and break her belongings. She also reported that their child had heard them yelling at each other but that he had never seen any act of physical violence. During an interview with another DHS caseworker, the child said that he did not like it when father was mean to mother and that he did not like how father spoke to mother. He said that he would get scared and hide under the covers on his bed.

Shortly thereafter, DHS filed a dependency petition requesting that the juvenile court take jurisdiction of that child. Just a few weeks later, mother gave birth to the couple's second child, and DHS filed a dependency petition regarding that child as well. In both petitions, DHS alleged that domestic violence between mother and father created a "harmful environment" for their children.

In July 2009, mother admitted that father had committed domestic violence against her and that that violence had created a harmful environment for the children; as a result, the juvenile court took jurisdiction over the children as to her.

Both parents testified at father's jurisdiction hearing the next month, in August 2009. At that time, the two children were four years old and seven weeks old. Mother and father testified that they had been living apart for nearly four months and that they had no plans to reunite. They admitted that, during their relationship, they frequently argued with each other, although they denied that any physical violence had ever occurred. The state, however, called witnesses who

testified about the numerous occasions on which mother had admitted to being a victim of father's physical violence. The state also called a county mental health specialist who testified that a child in a home where physical violence occurs could also be injured, even if the violence is not directed at the child.

As we have noted, the juvenile court took jurisdiction over both children. The court expressly found that father had committed domestic violence against mother, despite their testimony to the contrary:

> "As to both petitions, there is no reasonable doubt in my mind that [father] has been a perpetrator of domestic violence against [mother], and that he's done it often, and that it was both physical and verbal. And I do find that it endangers the welfare of both these children.
>
> "* * * * *
>
> "I really have to say [father] that your testimony is very convincing as to the opposite of everything you say. You have very specific recollections of everything except the important stuff. And then [mother], I see her as someone who has been emotionally beat down by you, and Post Traumatic Stress, at least. That's my ruling."

On appeal of the juvenile court's decision, father argues that the juvenile court erred in assuming jurisdiction over the children. Father acknowledges that the state "proved that mother and father lived together off and on for seven years, they sometimes argued and yelled, and father was physically aggressive with mother on two or three occasions, once causing mother a black eye." Father's argument on appeal is, rather, that the court's factual findings do not meet the legal standard for establishing juvenile court jurisdiction—that is, "[e]ven if the state proved that domestic violence occurred between mother and father in the past, it failed to prove that either child was exposed to more than yelling or arguing or that such exposure may be harmful to a child." Furthermore, father contends that, due to the parents' testimony that they had been separated for several months at the time of the hearing and had no plans to reunite, "the state failed to prove that any yelling, arguing, or physical altercations continued between mother and father at the

time of the jurisdiction hearing or were likely to continue in the future."

The state insists that it was appropriate for the juvenile court to take jurisdiction of the children because father's domestic violence against mother created a reasonable likelihood of harm to the welfare of the children. According to the state, "[t]he evidence establishing father's repeated violence against mother and the evidence establishing how it has affected [the older child] are more than sufficient to support the juvenile court's conclusion that father's actions endangered the children." As to whether the state proved that father's domestic violence created a *current* risk of harm, the state insists that the juvenile court's credibility determination undermines that argument and that the record "establishes that father and mother have a long history of separating, getting back together, and continuing their violent habits." At the very least, the state concludes, father "is responsible for creating a harmful environment for the children" and that that fact alone is sufficient to establish juvenile court jurisdiction over the children as to him. The state responds that "the [juvenile] court's finding that father has engaged in domestic violence is sufficient for the juvenile court to establish jurisdiction."

As we have noted, after this case was submitted, the juvenile court entered two judgments "terminating jurisdiction and wardship"—one for each child at issue in this case. The judgments do not specify the basis for the court's decision. In a motion to dismiss, DHS asserts that, given that father's appeal arises from judgments that are no longer in effect, a decision by this court as to the merits in this case would no longer have a practical effect on the rights of the parties and is, therefore, moot.

■ Father counters that his appeal is not moot. In support of that assertion, he relies on a recent decision of this court, *State ex rel Juv. Dept. v. L. B.*, 233 Or App 360, 226 P3d 66 (2010), and asserts that the finding that jurisdiction was warranted on the basis of father's domestic violence against the mother "may affect father's employability," will have an effect in any future investigations by DHS of his or the child's circumstances, and "gives rise to social stigma."

In *L. B.*, the parents appealed a juvenile court judgment establishing dependency jurisdiction over their newborn based on a finding that the child had sustained a serious, unexplained injury as a result of the conditions and circumstances in the parents' home. *Id.* at 362, 364. When the juvenile court later dismissed jurisdiction on the ground that the conditions and circumstances in the parents' home no longer endangered the child, DHS moved to dismiss the case as moot. *Id.* at 364-65. Noting that "the [juvenile] court did not disturb the findings in its previous judgment asserting jurisdiction," we concluded that the parents' appeal was not moot. *Id.* at 365.

We based our conclusion on three considerations. First, we identified that the father had demonstrated a likelihood that the juvenile court's finding of jurisdiction would continue to have an adverse affect on the father's employment opportunities, relating to his ability to obtain appropriate security clearance. *Id.* at 363-64. Second, we observed that any findings underlying the jurisdiction judgment regarding abuse or neglect "negatively affect," *id.* at 365, the parents' record with DHS, "[i]n the event that DHS were to receive [another] report of child abuse[.]" *Id.* at 364. We characterized that consideration as "equally—perhaps, more—significant" than the first. *Id.* Third, we acknowledged that the parents "will suffer a social stigma associated with having their child removed from their care based on allegations of abuse or neglect," noting that, although that stigma alone might not be enough to conclude that a case is not moot, it—"coupled with" the other two considerations—established sufficient collateral, practical effects on the parents' rights to withstand a motion to dismiss on ground of mootness. *Id.* at 365.

In short, we agree with father that *L. B.* controls the outcome as to DHS's motion to dismiss based on mootness. Although this case does not involve a demonstrated likelihood that the jurisdiction judgment will adversely affect father's employment opportunities (indeed, he merely asserts in his response to DHS's motion to dismiss that it "may affect [his] employability"), this case does involve the other two considerations that we identified in *L. B.*—that is, the effect of

the juvenile court's judgment on any future DHS investigation and the social stigma associated with a finding that father perpetrated domestic violence. As we noted in *L. B.*, stigma alone might not be enough. Nevertheless, in this case, that stigma is coupled with a taint on father's record with DHS—a consideration that we described as "equally—perhaps, more—significant" than an adverse effect on employment opportunities. For that reason, we conclude that our decision in this case would have a practical effect on the parties' rights and deny DHS's motion to dismiss.

■       We turn, then, to the merits. Under Oregon's juvenile code, a juvenile court has "exclusive original jurisdiction" in a case involving a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others," ORS 419B.100(1)(c), or whose parents "[f]ailed to provide the person with the care, guidance and protection necessary for the physical, mental or emotional well-being of the person," ORS 419B.100(1)(e)(D). Our cases have established that a child's "condition or circumstances" warrant the protection of juvenile court jurisdiction when, "under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (citing *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993)). The focus of the jurisdictional inquiry is the *child's* condition or circumstances. *Id.* The state must prove, by a preponderance of the evidence, that there is a *current* risk of harm and not simply that the child's welfare was endangered at some point in the past. *See State ex rel Juv. Dept. v. S. A.*, 230 Or App 346, 347, 214 P3d 851 (2009) (accepting the state's concession that dependency petitions must allege a current risk to the child's welfare).

■       We are no longer required to review the evidence in a juvenile dependency case *de novo*. *See* ORS 19.415(3)(b) (providing that, in this type of case, "the Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record"). As we have noted, father does not request that we exercise our discretion to review this case *de novo*, and we decline to

do so. Accordingly, we review the juvenile court's legal conclusions for errors of law, but are bound by the court's findings of historical fact so long as there is any evidence to support them. *Emmert v. No Problem Harry, Inc.*, 222 Or App 151, 159, 192 P3d 844 (2008) (citing Or Const, Art VII (Amended), § 3; *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968)). Where findings are not made on disputed issues of fact and there is evidence from which those facts could be decided more than one way, we will presume that they were decided in a manner consistent with the juvenile court's ultimate conclusion. *Id.*

In this case, as we have noted, the state was required to prove that the children's condition or circumstances currently endanger the children's welfare, although it need only prove a risk of harm and not that actual harm has already occurred. As we have also noted, the juvenile court made express factual findings: (1) that father had physically abused mother "often" and (2) that father's physical and verbal abuse of mother "endangers the welfare" of the two children.

As to the court's first finding, father is correct that the inquiry does not end with whether father committed physical violence against mother; our inquiry relates to the *children's* conditions and circumstances and not those of the parents. Instead, our inquiry in this case is whether the violence between the parents creates a current risk of harm to the children's welfare—that is, the court's second finding. Given our standard of review, we must determine whether there is any evidence in the record to support such a finding.

We conclude that, although the record is slim on that point, the state's evidence meets the low any-evidence standard. There is evidence in the record that the older child is scared when the parents argue and that, according to the county mental health specialist, when there is physical violence in the home, a child may suffer an inadvertent injury. There is also evidence that, even if the parents were separated at the time of the hearing with no current plans to reunite, mother and father have been on and off again throughout their seven-year relationship. And, given that the incidents of father's physical and verbal abuse have occurred

throughout that period,[1] there is a reasonable likelihood that it would continue were the couple to again reunite. For that reason, there is evidence to support the court's finding that the parents' conduct presents a risk of harm even to the parents' newborn who has never lived with father and mother together.

Accordingly, we cannot say that there is *no* evidence to support the juvenile court's factual findings. Because those findings are sufficient to meet the statutory standards, we agree with the state that juvenile court jurisdiction was warranted in this case.

Motion to dismiss denied; affirmed.

---

[1] Given that there is evidence of both physical and verbal abuse, we need not decide whether the latter, standing alone, would suffice.