Argued and submitted December 8, 2011, reversed and remanded
February 8, 2012

In the Matter of
J. B., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

S. B.
and E. C.,
*Respondents,*

*v.*

J. B.,
*Appellant.*

Lane County Circuit Court
09625J;
Petition Numbers 09625J01, 09625J02;
A148989

273 P3d 196

Christa Obold-Eshleman argued the cause and filed the brief for appellant.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent Department of Human Services. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

No appearance for respondents S. B. and E. C.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

Child appeals a juvenile court order denying his motion for a judgment of nonpaternity as to C, a man who claims to be his biological father. ORS 419A.200(1); ORS 419A.205(1)(d). On appeal, child contends, *inter alia*, that, because C's paternity had not been previously established— the legal consequence of which was that child had no "legal father" pursuant to ORS 419A.004(16)—the juvenile court erred in denying his motion for a judgment of nonpaternity. As amplified below, we conclude that the juvenile court erred in determining that it had previously established C's paternity and, as a consequence, erred in treating child's motion as an untimely motion to set aside a prior paternity determination. Accordingly, we reverse and remand for the court to consider the merits of child's motion under ORS 419B.395, the statute authorizing the issuance of judgments of paternity and nonpaternity during the pendency of a juvenile proceeding, such as this one, where a child has no "legal father."

Before turning to the facts and the parties' contentions, it is necessary to provide some statutory orientation. Under the operative statutes, the ultimate issue in this matter is whether C is child's "legal father." A "legal father," as pertinent here, is defined to mean "[a] man * * * whose paternity has been established or declared under ORS 109.070 * * * or by a juvenile court[.]" ORS 419A.004(16)(a).

ORS 109.070(1), in turn, provides, as pertinent to this case, that a person's paternity may be established in one of two ways. First, ORS 109.070(1)(e) provides that paternity may be established "[b]y filing with the State Registrar of the Center for Health Statistics the voluntary acknowledgment of paternity form as provided for by ORS 432.287."[1] Second,

---

[1] *See* ORS 432.287(1) (providing, in part, that "[t]he Director of the Oregon Health Authority shall adopt by rule a form of a voluntary acknowledgment of paternity that includes the minimum requirements specified by the United States Secretary of Health and Human Services. When the form is signed by both biological parents and witnessed by a third party, the form establishes paternity for all purposes when filed with the State Registrar of the Center for Health Statistics, provided there is no male parent already named on the birth certificate."); ORS 432.287(2) (prescribing the content of a voluntary acknowledgment of paternity form).

ORS 109.070(1)(g) provides that paternity may be established "[b]y paternity being established or declared by other provision of law."[2]

During the pendency of a juvenile proceeding, when a child has no "legal father" because paternity has not been established, ORS 419B.395 authorizes the court to enter a judgment of paternity or nonpaternity. Specifically, ORS 419B.395(1) provides, in pertinent part:

"If in any proceeding under ORS 419B.100 or 419B.500 the juvenile court determines that the child * * * has no legal father[3] * * *, the court may enter a judgment of paternity or a judgment of nonpaternity in compliance with the provisions of ORS 109.070, 109.124 to 109.230, 109.250 to 109.262 and 109.326."

Proceeding within that legal context, we turn to the facts of this case.

We "are bound by the court's findings of historical fact so long as there is any evidence to support them."[4] *State v. S. T. S.*, 236 Or App 646, 655, 238 P3d 53 (2010). Accordingly, "we state the facts consistently with those findings and augment them where necessary with uncontroverted background and procedural facts." *DHS v. Three Affiliated Tribes of Fort Berthold*, 236 Or App 535, 542, 238 P3d 40 (2010).

The circumstances material to our review span a period of roughly 20 months, between child's birth in September 2009 and the juvenile court's denial of child's motion for a judgment of nonpaternity in May 2011. Those

---

[2] *See, e.g., Thom v. Bailey*, 257 Or 572, 596, 600, 481 P2d 355 (1971) (declaratory judgment proceeding and proceedings for determination of heirship considered other provisions of law for purposes of the then extant version of ORS 109.070(1)(g)).

[3] For purposes of ORS 419B.395, the term "legal father" has "the meaning given that term in ORS 419A.004(16)." ORS 419B.395(4)(c).

[4] In his opening brief, child requests that we exercise our discretion to review *de novo* the juvenile court's determination that, as of the time that child sought the judgment of nonpaternity, previous actions and rulings by the court had already deemed C to be child's "legal father." *See* ORS 19.415(3)(b) (providing that, in this type of case, "the Court of Appeals, acting in its sole discretion, may * * * make one or more factual findings anew upon the record"). We decline to exercise our discretion to review that determination *de novo* because it is not a "factual finding" but, rather, it represents a legal conclusion that we review for errors of law.

circumstances involved not only the interactions between C and mother and child, but also, as significantly, the tortuous course of dependency proceedings before the juvenile court.

When child was born in September 2009, both he and mother tested positive for methamphetamine. No father was identified on child's birth certificate. Within days of child's birth, Sarah Fancey, who was child's initial Department of Human Services (DHS) caseworker and who the court found to be "very credible," spoke with mother about child's paternity. During that conversation, mother told Fancey that she was unable to identify child's biological father. Mother also signed a DHS questionnaire indicating that she was unable to identify child's father.[5]

Mother entered in-patient drug treatment but was allowed to go to the hospital every day to bond with and care for child, who remained hospitalized for some time. C was present at the hospital for at least some of those visits.

When Fancey asked mother about C's visits, she did not identify him as child's father but, instead, described him as providing "emotional support." According to Fancey, her impression, as well as the impression of the in-patient treatment providers and hospital staff, was that, "given [mother's] in-patient status, she had no opportunity to spend time with [C] unless it were at the hospital during her time outside of treatment." In sum, Fancey testified that, to the extent that C was identified as child's father, it was for "a self-serving purpose to be able to spend time with his romantic partner" and not because he was "interested in * * * establishing paternity."

In October 2009, DHS filed a petition to obtain jurisdiction over child as to mother only. That petition indicated that child had no legal father. Thereafter, in January 2010, the juvenile court entered a jurisdictional judgment as to mother. Although mother initially had physical custody of child, on March 8, child was placed in nonrelative foster care.

---

[5] Nevertheless, hospital records indicate that mother told hospital staff that C was child's father and that hospital staff referred to C as such. Further, the hospital's birth announcement referred to C as child's father.

About a week later, mother—who had, as noted, originally signed a DHS questionnaire stating that she was unable to identify child's father—completed a second DHS questionnaire, identifying C as child's father. In that questionnaire, mother noted that (1) C had come to the hospital for "4 weeks" and to her in-patient treatment center "approx[imately] 2 times"; (2) C had provided clothes and bottles to child; (3) C had told her and others that he is child's father; and (4) neither she nor C had established child's legal paternity.

On March 22, a DHS caseworker met with C. According to the case notes, C said that (1) mother had told him that he is child's biological father and "called him when [child] was placed in foster care and told him to call DHS"; (2) he and mother had been living together in his van when she became pregnant and lived there during her pregnancy but broke up about two months before child's birth; and (3) his "family knows about [child,] and they are encouraging him to get 'custody of some kind' " even though "they haven't met [child] or [mother] yet." Further, C expressed an interest in visiting child and being involved in child's case plan. Blood testing was not conducted—and has never been conducted— to determine whether C is, in fact, child's biological father.[6]

Thereafter, on March 30, the state filed a second jurisdictional petition that concerned C only and identified him as child's "putative father."[7] On March 31, at a shelter hearing concerning that petition, DHS's attorney told the court that mother and C had signed a voluntary acknowledgment of paternity, *see* ORS 109.070(1)(e), and asked the judge to notarize it, which he did. Immediately thereafter, at the request of DHS, the court amended the petition concerning

---

[6] *See* ORS 109.250 to 109.262 (the Uniform Act on Blood Tests to Determine Paternity).

[7] *See* ORS 419B.875(3) ("A putative father who satisfies the criteria set out in [ORS 419B.875(1)(a)(C)] * * * shall be treated as a parent, as that term is used in this chapter * * *, until the court confirms his paternity or finds that he is not the legal or biological father of the child * * *."); ORS 419B.875(1)(a)(C) (providing, in part, that a "putative father" is one "who has demonstrated a direct and significant commitment to the child * * * by assuming, or attempting to assume, responsibilities normally associated with parenthood").

father to delete any reference to his alleged "putative" status. In response, C's attorney indicated that

> "[C] intends to work with the agency. He'd also like the agency to look at relatives. They have assured me they will be doing that, but he does want that to happen."

At the conclusion of the March 31 shelter hearing, the court set a jurisdictional hearing for May 18.

Following the shelter hearing, child's caseworker, Catie Reich, sought to file with the State Registrar of the Center for Health Statistics the voluntary acknowledgment of paternity that mother and C had executed. However, she was unable to do so. According to Reich, within a couple of weeks, she knew that the acknowledgment had been "kicked back because it was the old form dated incorrectly." Nonetheless, Reich did not inform the court that the voluntary acknowledgment of paternity had not been filed—the consequence of which was that the acknowledgment was not legally effective to establish C's paternity. *See* ORS 109.070(1)(e) (providing generally that "filing" the voluntary acknowledgment "establishes paternity for all purposes").

Father failed to appear at the May 18 jurisdictional hearing after having received proper notice. Subsequently, on June 10, the court entered a default jurisdictional and dispositional judgment as to father.

Meanwhile, on May 26, following the jurisdictional hearing but before entry of judgment, C had met with Reich and signed a second voluntary acknowledgment of paternity and an action agreement. However, DHS was unable to file that acknowledgment because mother, whose whereabouts were unknown to DHS, had not signed it.[8] Reich also arranged for a visit between C and child, but, according to Reich, C was a no-show." Further, although C began drug and alcohol treatment at some point during the summer, he was no longer engaged in treatment as of early October.

---

[8] According to Reich, at some point after her May 26 meeting with C, a case note indicating that C had signed a new acknowledgment "went out in Discovery to all parties on the case."

On January 14, 2011, the court entered a permanency judgment changing the case plan from reunification to adoption. In that judgment, the court noted that mother had not visited child since May 2010, had failed to engage in court-ordered services, and had not maintained contact with DHS. The court also noted that C had failed to comply with the terms of his probation, had not engaged in court-ordered services, and had failed to maintain contact with DHS.

On January 19, five days after the permanency judgment had been entered, DHS filed a third jurisdictional petition. That petition identified a new man, W, as child's "presumed legal father" because child had been born within 300 days of W and mother's divorce.[9] That petition denominated C as child's "putative father," rather than "father."

On February 4, DHS filed (1) a motion for a judgment of nonpaternity as to W and (2) petitions to terminate mother's and C's parental rights. The court granted the former, and, ultimately, on March 21, entered a judgment dismissing the third jurisdictional petition concerning W.

On March 31, 2011, child filed the motion for a judgment of nonpaternity that is the subject of this appeal. Specifically, child contended that C's paternity had not been previously established because the original (March 31, 2010) voluntary acknowledgment had not been filed and that, "[a]lthough [C] has been portrayed as the legal father of [child], at the present time the child is without a legal father." For those reasons, child asserted that the court should entertain his motion and enter a judgment of nonpaternity.

Child acknowledged that a petition to terminate C's parental rights was pending. Nevertheless, child asserted that a judgment of nonpaternity was necessary because, without one, C would be considered child's "parent" and DHS

---

[9] *See* ORS 109.070(1)(b) ("A man is rebuttably presumed to be the father of a child born to a woman if he and the woman were married to each other and the child is born within 300 days after the marriage is terminated by death, annulment or dissolution or after entry of a judgment of separation."). Apparently, DHS was unaware of W's existence until shortly before it filed the third jurisdictional petition.

would be required to give C's relatives preference as placement resources, which was something that child opposed.[10]

In its response to child's motion, DHS "agree[d] that [C] ha[d] not been established as the child's legal father by any of the processes described in [the pertinent] statutes." Further, DHS acknowledged that it "is required by statute and administrative rule to make diligent efforts to place children with relatives, which includes a number of relationships to the child through the child's parent."

Nonetheless, DHS contended that C was child's biological father and that it was too late in the process for child to raise the issue of his paternity. Specifically, DHS explained:

> "It's the agency's position that this is the biological father of the child. Now, to what standard we can demonstrate that is questionable, Your Honor, but it's noted in the case file from way back that this child resembles [C]. [C] states that it is his child. He visits the child in the hospital. He and mom both signed voluntary Affidavits of Paternity, so there is evidence in the record to suggest that he is the biological father of this child.
>
> "* * * * *
>
> "* * * He's been found by the Court in jurisdiction, and disposition to be a party to this case, and he has repeatedly signed documents stating that he is the biological father of the child and attempted to become a legal father of this child."

Moreover, DHS contended that it "is incredibly far into a case and permanency planning for this child to raise this issue." In particular, DHS noted that "we got jurisdiction on him and disposition early on" and that "[t]his isn't some case where he came up late in the process."

---

[10] *See* ORS 419A.004(16) (defining "parent" to include a child's "legal father"); *see, e.g.*, OAR 413-120-0720 (providing that DHS's "preference for placement of a *child* for the purpose of adoption is placement with relatives and placing siblings together" (emphasis in original)); OAR 413-120-0730(1) (providing for the identification and assessment of adoptive resources in a particular order of preference in which certain relatives are evaluated first); OAR 413-120-0710(12) (defining "relative" to include, among others, a parent's blood relatives). The proper application of those rules is not at issue in this appeal, and we imply no view on that matter.

The juvenile court denied the motion on the ground that it was untimely. The court determined that "[C] ha[d] been made the father by this court." According to the court, by the time that it had entered the jurisdictional judgment as to father, the court had

> "dutifully said, okay, we have a father and this is how we are going to proceed from here. I think once the court did that, the Court ratified that mistake in conclusion, and I just don't think it can be attacked now, after the fact."

The court acknowledged that child's attorney at the time had "raised this issue probably as soon as she kind of took a look at all of the Discovery[.]" Nevertheless, the court explained that, "since the child was the moving party and the child was always represented, this was just not a timely Motion and that's the basis for my Ruling against the Motion."

As we understand it, the court's ruling was predicated on its determination that, when it entered the June 10 jurisdictional judgment as to father, based on the mistaken assumption that paternity had been previously established by the filing of a voluntary acknowledgment of paternity, the court itself established C's paternity—the legal consequence of which was that C is child's "legal father" pursuant to ORS 419A.004(16). Proceeding from that premise, the court appears to have (1) treated child's motion not as one for a determination of nonpaternity but, instead, as a request to set aside a previous paternity determination effected by the jurisdictional judgment, and (2) deemed child's motion, so characterized, to be untimely.

Child appeals, contending that the court erred in denying his motion for a judgment of nonpaternity.[11] Specifically, child contends that, because "the juvenile court in fact never entered a judgment of paternity, nor was paternity

---

[11] Before child filed his notice of appeal, the court entered a judgment terminating C's parental rights—a judgment that child did not appeal. Child asserts that, even though C's rights have been terminated, this appeal is not moot because a collateral consequence exists—*viz.*, that DHS "is required to give preference to relative placements, including extended family of parents, under both statute and regulation." We agree with child that, in light of that collateral consequence, this appeal is not moot.

We also note that, after child filed his notice of appeal, the juvenile court entered a judgment terminating mother's parental rights.

legally established in any other way," the court had not made C child's "legal father" and the court should have granted his motion for a judgment of nonpaternity. Alternatively, child contends that, if the June 2010 jurisdictional judgment as to C "did make [C] the legal father, the juvenile court erred in finding that the child's motion was not timely enough to set [it] aside."

DHS remonstrates that the juvenile court correctly concluded that C's paternity had been established by the June 10 jurisdictional judgment. Further, DHS contends that the juvenile court did not abuse its discretion in denying the motion as untimely.

As framed by the parties' contentions, the striking point for our analysis is the legal propriety of the juvenile court's conclusion that C is child's "legal father" as defined by ORS 419A.004(16), which, in turn, was predicated on the juvenile court's determination that it had established C's paternity when it entered the June 2010 jurisdictional judgment. That is so because, if the juvenile court had previously established C's paternity such that C is child's "legal father," the court properly treated child's motion as one to set aside a previous paternity determination. However, if the court had not previously established C's paternity, so that child has no "legal father," the court erred in treating child's motion as one to set aside a previous paternity determination and the case must be remanded for the court to consider the merits of child's motion under ORS 419B.395(1)—the statute authorizing the issuance of judgments of paternity and nonpaternity during the pendency of juvenile proceedings where there is no "legal father."

As previously explained, 248 Or App at 24, a "legal father" is one "whose paternity has been established or declared under ORS 109.070 * * * or by a juvenile court[.]" ORS 419A.004(16)(a). As pertinent to this case, in order for C to be child's "legal father" his paternity must have been established or declared in one of three ways—*viz.*, (1) C's paternity must have been established by the filing of a proper voluntary acknowledgment of paternity, as provided in ORS 109.070(1)(e); (2) C's paternity must have been "established or declared by other provision of law," as provided in ORS

109.070(1)(g); or (3) C's paternity must have been established or declared by the juvenile court, as provided in ORS 419A.004(16)(a). None of those requirements has been satisfied under the circumstances of this case.

Here, it is undisputed that C attempted to establish his paternity in only one way—that is, he attempted to establish his paternity through a voluntary acknowledgment as described in ORS 109.070(1)(e). As noted, his attempt failed because a proper voluntary acknowledgment of paternity was never filed. DHS was aware that C's paternity had not been legally established pursuant to ORS 109.070(1)(e). However, the court was not so aware. Thus, at the time that the juvenile court entered the June 10 jurisdictional judgment, it was operating under the mistaken assumption that C's paternity had been previously established through a voluntary acknowledgment, as provided in ORS 109.070(1)(e). At no point did the juvenile court seek to establish C's paternity under any other provision of law, as provided in ORS 109.070(1)(g), nor did the court seek to independently establish or declare C's paternity, as provided in ORS 419A.004(16)(a).[12]

---

[12] DHS contends that, even if the jurisdictional judgment did not expressly determine the issue of C's paternity, it did so "by inference." In other words, as we understand it, DHS contends that, even if the juvenile court had not expressly determined the issue of C's paternity in the jurisdictional judgment, it necessarily determined C's paternity when it asserted jurisdiction over him. In support of that contention, DHS points to ORS 109.072(1)(b), which defines the term "paternity judgment" as

"a judgment or administrative order that:

"(A) Expressly or *by inference determines* the paternity of a child, or that imposes a child support obligation based on the paternity of a child; and

"(B) Resulted from a proceeding in which blood tests were not performed and the issue of paternity was not challenged."

(Emphasis added.)

We reject DHS's contention without extended discussion, noting only two salient observations. First, a determination of paternity does not appear to be a prerequisite to every jurisdictional judgment. *See* ORS 419B.875(3) ("A putative father who satisfies the criteria set out in [ORS 419B.875(1)(a)(C)] * * * shall be treated as a parent, as that term is used in this chapter * * *, until the court confirms his paternity or finds that he is not the legal or biological father of the child * * *."). Second, under the circumstances of this case, in which the court mistakenly assumed that paternity had been previously established by operation of ORS 109.070(1)(e), the June 10 jurisdictional judgment did not *determine* the issue of C's paternity expressly or otherwise. *See Webster's Third New Int'l Dictionary* 616 (unabridged ed 2002) (defining "determine" to mean, *inter alia*, "to settle a question or controversy about : decide by judicial sentence").

Accordingly, the juvenile court erred in determining that C's paternity had been established and, for that reason, that C was child's "legal father." That legal error, in turn, led to the juvenile court's erroneous treatment of child's motion as a motion to set aside a prior paternity determination—and yet again, in turn, to the court's denial of child's motion as untimely.

Because of those errors, the court failed to evaluate child's motion under the operative statute—ORS 419B.395, which by its terms authorizes the juvenile court to determine paternity during the pendency of a juvenile proceeding such as this one when child has no "legal father." For that reason, we must remand the case to the juvenile court to determine the merits of child's motion under ORS 419B.395.[13]

Reversed and remanded.

---

[13] Our analysis and disposition obviates the need to consider any of child's remaining contentions on appeal.