JAMES, J.
*719 In this step-parent adoption proceeding, birth father appeals a judgment allowing his two children to be adopted without his consent, assigning error to the trial court's finding that he had willfully neglected, without just and sufficient cause, to provide proper care and maintenance for the children for the year preceding mother and step-father's filing of the petition for adoption. ORS 109.324. We affirm.
We review the trial court's legal conclusions for errors of law, but are bound by the court's findings of historical fact so long as there is any evidence to support them. State v. S. T. S. , 236 Or. App. 646, 655, 238 P.3d 53 (2010). In this case, the trial court found that mother and birth father were married on January 30, 2010. The marriage produced two children, the subjects of this appeal. Mother and father divorced April 15, 2014. The General Judgment of Dissolution of Marriage awarded sole custody of the children to mother. Birth father was granted restricted, supervised, nonovernight parenting time on Saturday mornings for a specific three-hour period. As part of that same judgment, birth father was required to enroll in a drug and alcohol evaluation program with a "reputable evaluator," comply with all terms of the drug and alcohol evaluation program, including treatment, and have three consecutive, random urinalysis tests. Birth father did not complete those requirements prior to mother filing the petition for adoption.
Mother relocated to Tillamook, Oregon, in March 2014, to live with her parents. Birth father exercised his supervised visits on three occasions at mother's parents' house in 2014. Birth father has not had physical contact with the children since late June, 2014. In May, 2015, birth father left mother a voicemail informing mother that he would be coming to take his children. Mother contacted the Tillamook County Sheriff's office. She was advised to change her phone number, change her vehicle, and get a post office box for mail. She only changed her cell phone number, and her mailing address remained at her parents' house.
In November 2015, birth father was arrested on criminal charges in Washington, and spent time in and out of jail from November 2015, through March 10, 2016. He *720 was out of custody from March 10, 2016, until June 1, 2016. On June 17, 2016, birth father was convicted of crimes unrelated to his children or ex-wife, and sentenced to 22 months at the Washington Corrections Center. He was transferred to the Clackamas County jail for probation violations in April 2017, where he remained until late May 2017. In July 2016, mother remarried and moved to Carlton, Oregon.
While birth father was incarcerated in August 2016, he sent a letter to mother's parents' house. The letter was addressed to *87 people in addition to the children, including mother, mother's father, mother's mother, and three other relatives of mother's. Around this same time, in August 2016, birth father sent a request to the State of Washington Division of Child Support, requesting mother's address. Birth father testified that the purpose of the request was to contact the children. The State of Washington Division of Child Support denied birth father's request, explaining that it had information that indicated the release of mother's address may result in emotional or physical harm to either the "other party in the case or to the children." Birth father appealed that denial in October 2016, and the denial was upheld on appeal. In December 2016, birth father sent another letter to mother's parents' home. That letter was addressed to birth father's two children. Birth father testified that those were the only two communications he attempted to make to the children. Birth father also testified that he contacted his own mother and father by phone during his incarceration in the year preceding the filing of the adoption petition.
In the 12 months prior to the filing of the petition for adoption, mother received, through support enforcement, $23.10 in child support payments. Mother remarried on July 16, 2016. The petition for adoption was filed on May 25, 2017. The trial court found that mother and step-father proved by "clear and convincing evidence that Birth Father has willfully neglected, without just and sufficient cause, to provide proper care and maintenance for the children for the year preceding the filing of the Petition for Adoption." The court also found that birth father "willfully failed to manifest substantial expressions of concern that show he had a deliberate, intentional, and good-faith interest in *721 maintaining a parent-child relationship during the year preceding the filing of the Petition for Adoption." The trial court found that the two letters sent to mother's parents' house were "the only contacts that Birth Father had or attempted to have with the children from June 28, 2014 to May 25, 2017." The trial court explained that those letters were incidental contacts, and that:
"There was much more that Birth Father could have done to demonstrate a good faith interest in maintaining a parent-child relationship with the children. Birth Father could have sent more letters to the children through the grandparents. Birth Father could have made more effort to obtain telephonic communication with the children through the grandparents. There was some effort of Mother's part to restrict Birth Father's contact with the children; however, Mother's actions were taken with good cause. Although Birth Father was incarcerated during the majority of the one-year period prior to the filing of the Petition for Adoption, and the ways that he could have maintained his relationship with the children were impaired, the incarceration was not just and sufficient cause for his willful neglect of the children."
On May 10, 2018, the trial court ordered that the consent of birth father was not required, and that the adoption could proceed notwithstanding the objection of birth father. Birth father appealed. On appeal, he argues that petitioners' proof was inadequate to prove that he had willfully neglected his children, without sufficient cause, in the year preceding the filing of the adoption petition.[1] Mother argues that there was evidence to support the trial court's findings that the letters constituted "incidental" contact within the meaning of ORS 109.324(3) ; birth father did not have good and sufficient cause to have neglected the children; and therefore the trial court did not err in holding that the adoption should proceed without birth father's consent.
ORS 109.324 provides, in relevant part:
"* * * * *
*722 "(2) Upon hearing or when the parent has failed to file a written answer as required in ORS 109.330 (3), if the court finds that the parent has willfully deserted the child or neglected without just and sufficient cause to provide proper care and *88 maintenance for the child for one year next preceding the filing of the petition for adoption, the consent of the parent at the discretion of the court is not required and, if the court determines that the parent's consent is not required, the court may proceed regardless of the objection of the parent.
"(3) In determining whether the parent has willfully deserted the child or neglected without just and sufficient cause to provide proper care and maintenance for the child, the court may:
"(a) Disregard incidental visitations, communications and contributions; and
"(b) Consider, among other factors the court finds relevant, whether the custodial parent has attempted, without good cause shown, to prevent or to impede contact between the child and the parent whose parental rights would be terminated in an action under this section."
As the Supreme Court has interpreted "willful neglect," in the context or ORS 109.324, we ask whether, during the year preceding the filing of the petition for adoption, the "nonconsenting parent willfully fail[ed] to manifest substantial expressions of concern which show that the parent has a deliberate, intentional, and good faith interest in maintaining a parent-child relationship[.]" Eder v. West , 312 Or. 244, 266, 821 P.2d 400 (1991) (emphasis added). Eder defined "incidental" to mean "occurring merely by chance or without intention or calculation; being likely to ensue as a chance or minor consequence; not receiving much consideration. Webster's Third New Int'l Dictionary 1152 (unabridged 1961)." Id. at 266 n. 24, 821 P.2d 400 (internal citation in original). By statute, the period of time to be examined is the year preceding the filing of the petition for adoption. ORS 109.324(2).
In Pizano-Varela v. Gomez , 103 Or. App. 629, 798 P.2d 724 (1990), we reiterated that "the relevant time period for determining willful neglect is the one-year period just before the filing of the petition for adoption." Id. at 632, 798 P.2d 724. In *723 that case, the mother was 14 years of age when she gave birth to the child, in 1983, who was the subject of the petition for adoption. Id. at 631, 798 P.2d 724. The mother left the state and child roughly two years after the child's birth, and made no child care arrangements. Id. The mother made one visit to the child in 1989 after being served with notice of custody proceedings. Id. Otherwise there had been no contact with the child, including no gifts, no cards, no letters, and no support. Id. The trial court "concluded that mother's actions were not willful [neglect], primarily because she was very young when she abandoned her child." Id. at 632, 798 P.2d 724. We reversed, holding that "the relevant time period for determining willful neglect is the one-year period just before the filing of the petition for adoption," and though acknowledging she was a minor when she left the child, the court noted that in the relevant time period, the mother was 19 or 20 years old, married, raising a second child, and lived in the same area as the father of the child at issue. Id. Because she was capable of making "adult decisions" in the year before the petition was filed, her actions constituted willful neglect. Id. at 633, 798 P.2d 724.
In this case, the court found that, during the year preceding the filing of the petition for adoption, birth father failed to manifest substantial expressions of concern that show he had a deliberate, intentional, and good-faith interest in maintaining a parent-child relationship. The evidence in the record supports that finding. Birth father testified that in the year preceding the petition for adoption, he mailed two letters intended for his children. There was also testimony that birth father contacted the Department of Human Services (DHS) for mother's address after the first letter was sent, but was denied mother's current address. Birth father sent a second letter to mother's parents' house after that denial, and did not send further communications intended for the children. Only the second letter was addressed exclusively to the children, and could be considered more than incidental, i.e. , it was sent with the intent of contacting the children. See Eder , 312 Or. at 266 n. 24, 821 P.2d 400. However, even if we construed both letters as intended for the children, one or two contacts over the course of a year does not rise to the level of a substantial expression of concern in this *89 case. There *724 was no other attempted contact with the children within the relevant time period.[2] The court did not err in finding that birth father failed to manifest substantial expressions of concern in the year preceding the filing of the adoption petition.
Our inquiry does not end there, however. "If a court finds that a parent has neglected his or her children, the relevant inquiry shifts to whether just and sufficient cause excuses the parent's neglect." C. R. H. v. B. F. , 215 Or. App. 479, 486, 169 P.3d 1286, rev. den. , 343 Or. 690, 174 P.3d 1016 (2007). In C. R. H. , the father intentionally committed egregious crimes against a relative who was a minor. Id. at 481, 169 P.3d 1286. DHS determined that the mother was a suitable parent for the children and the mother was allowed to retain custody of children on the condition that she not allow contact between the father and the children. Id. Because of the nature of the crimes, as part of the father's post-prison supervision terms, he was prohibited from having any contact with his children for four years. Id. at 482, 169 P.3d 1286. During the period of time the father was prohibited from contact, the mother and step-father petitioned the court to grant a step-parent adoption over the father's objection. Id. We held that although the father willfully committed the crimes, and could arguably be found to have neglected the children, there was "just and sufficient cause to excuse his failure to provide proper care and maintenance for the children." Id. at 486, 169 P.3d 1286. We so found because "a court order or post-prison supervision condition prohibiting contact with a child is a more significant limitation imposed on the parent's ability to visit or contact the child." Id. at 486-87, 169 P.3d 1286 (internal quotation marks and brackets omitted).
Here, birth father was incarcerated for almost the entirety of the relevant one-year period. However, the mere fact of incarceration alone is not just and sufficient cause to excuse a parent's neglect. Birth father did not testify that there was a court order or term of post-prison supervision, or any other legal prohibition on his contact with the children.
*725 Birth father did testify that he was indigent at the time of his incarceration. The financial hardships of communications on the incarcerated are a difficult reality of which this court is aware. Both letters were sent while father was incarcerated. There are those who are in a position where even the money to pay for postage is difficult to come by. However, birth father testified that he worked in the highest paying position available to him during his incarceration. He also testified that he had telephone contacts with his father and mother during his incarceration. Additionally, he testified that, although email was available to him as a communication tool, he did not send emails to anybody, including mother or other family members, because he did not "want to stand in line and wait for the JPay machine."
On this record, the trial court's finding that birth father's incarceration was not just and sufficient cause for his failure to manifest the required expressions of concern in the year preceding the filing of the petition for adoption was supported by evidence in the record. Accordingly, we conclude that the trial court did not err when it ordered the adoption to go forward without birth father's consent.
Affirmed.

Birth father also argues that petitioner's proof was inadequate to prove he willfully deserted his children without sufficient cause. Because the order's specific language refers to neglect, we focus our analysis on the "neglect" aspect of birth father's argument.

On appeal, birth father points to Facebook posts he made regarding his interest in his children to demonstrate he attempted other contacts, but those posts are both before and after the relevant time period. None occurred during the relevant one-year period. We express no opinion on whether Facebook posts made during the relevant time period would bear on our analysis.