Argued and submitted November 16, 2004, reversed and remanded
with instructions October 26, 2005

In the Matter of
Emily Wieskamp, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF DESCHUTES COUNTY,
*Appellant,*

*v.*

Jenia Lynn VANBUSKIRK,
Chris Wieskamp, Emily Wieskamp, and
Court Appointed Special Advocate,
*Respondents.*

238230; A121264

122 P3d 116

Judy C. Lucas, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Mikel R. Miller waived appearance for respondent Jenia Lynn Vanbuskirk.

No appearance for respondent Chris Wieskamp.

No appearance for respondent Emily Wieskamp.

No appearance for respondent Court Appointed Special Advocate.

Before Haselton, Presiding Judge,* and Brewer, Chief Judge, and Deits, Judge pro tempore.

DEITS, J. pro tempore.

_____

* Haselton, P. J., *vice* Edmonds, P. J.

## DEITS, J. pro tempore

In this juvenile dependency proceeding, the state, on behalf of the Juvenile Department of Deschutes County, petitioned for juvenile court jurisdiction over mother, father,[1] and their child, E. Following the jurisdictional hearing, the juvenile court concluded that the state had not presented sufficient evidence to establish jurisdiction as to mother and dismissed the petition as to her. On appeal, the state challenges the dismissal of the petition. On *de novo* review, ORS 419A.200(6)(a), we reverse.

A juvenile court has jurisdiction over a child "[w]hose condition or circumstances are such as to endanger the welfare of the person * * *." ORS 419B.100(1)(c). The statute further provides that the juvenile court has jurisdiction over a child whose parents have failed "to provide the person with the care, guidance and protection necessary for the physical, mental or emotional well-being of the person[.]" ORS 419B.100(1)(e)(D).

The jurisdictional petition in this case alleged that the juvenile court had jurisdiction because the "conditions and circumstances" were such as to endanger E's welfare. Specifically, the petition alleged:

"1) The child is within the jurisdiction of the Court by reason of the following facts:

"Said child is in need of the services of the Court in planning for the child's best interest in that [her] conditions and circumstances are such as to endanger [her] physical, emotional, and mental well-being, to wit:

"I. The mother has failed to provide the child with the care, guidance, and protection necessary for the child's physical, mental, or emotional well-being, by reason of the following facts: The mother allows the child to attend school in soiled clothes and clothes which smell of urine; the child arrives at school with very poor hygiene, as exhibited by

---

[1] The petition alleged that father lives in Arizona and has done nothing to protect child from mother's neglect. It also alleged that he was aware of the allegations in the petition and had done nothing to assert custody of child. Father did not contest those allegations before the juvenile court and the juvenile court found jurisdiction as to him. Father does not appear on appeal.

unwashed face and hands, unbrushed teeth, not wearing feminine hygiene products when needed, and wearing dresses without underwear; the mother allows the child to attend school without eyeglasses she needs; the mother did not immediately seek medical attention for the child when the school and DHS notified the mother that the child was in persistent pain when using the toilet and participating in physical education class; and the child is a past victim of sexual abuse and she is not participating in therapy to address her victimization.

"II. On or around 12/10/99, [E] was a victim of physical abuse perpetrated by her mother."

As noted above, the trial court dismissed the petition for juvenile court jurisdiction as to mother. The trial court did not make any express credibility findings nor did it appear to resolve the conflicts in the evidence as to the exact degree of E's problems or the cause of her problems. The court found with regard to the hygiene issue that "I think it's clear that, for whatever reason, the mother in this case needs to make some changes." It also found that E needed "some type of counseling." The court concluded that the problem with eyeglasses did not "in and of itself" provide the basis for jurisdiction and ultimately held that the evidence was insufficient to establish that E needed the court's protection. The state assigns error to the trial court's dismissal of the petition.

■■■■ The key inquiry in determining whether "condition or circumstances" warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child. *State ex rel Juv. Dept. v. Smith,* 316 Or 646, 652-53, 853 P2d 282 (1993); *State ex rel DHS v. Kamps,* 189 Or App 207, 213, 74 P3d 1123 (2003). It is the *child's* condition or circumstances that are the focus of the jurisdictional inquiry. In deciding if the juvenile court has jurisdiction, the court must determine if the child needs the court's protection, not the nature or extent of the necessary protection. *See State ex rel Juv. Dept. v. Brammer,* 133 Or App 544, 549 n 5, 892 P2d 720, *rev den,* 321 Or 268 (1995) ("Our decision merely places the children under the protection of the juvenile court. Whether or not they remain in the home will be determined in a subsequent proceeding."). Accordingly, on *de novo* review, we must decide whether,

after considering the *totality* of the circumstances, the evidence establishes that E's condition and circumstances are such that there is a reasonable likelihood of harm to her welfare. After reviewing the record, we conclude that the state proved that mother failed to provide E with necessary care, guidance, and protection and that, as a result, E's conditions and circumstances endangered her physical, emotional, and mental well-being.

At the time of the jurisdictional hearing, E was 14 years old. She is developmentally delayed with a low IQ and has been in the special education program in middle school and now in high school. As alleged in the petition, the evidence shows that, over a significant period of time, E had come to school inadequately dressed and with serious hygiene deficiencies. E's teachers and the school nurse testified consistently that she often came to school reeking of urine. They also said that her hair, body, and clothes were often dirty. It was also common that she was not wearing socks or underwear. Further, E often came to school late. School officials frequently had E shower after she came to school and had extra clothes at the school for her to wear because of the constant need to clean her up.

Holliday, a teacher at the middle school that E attended, had E in her class for the four years that E was at the middle school. She testified regarding the hygiene and other problems that E had during the time that she was in her class. She described E's hygiene problems as follows:

"The clothing * * * wasn't clean, usually. [E] herself wasn't clean, often had dirty hair, or not brushed from the morning, I'm not going to say it was food on her face, but dirt of some kind on her face, and her hands were dirty. It was apparent from my point of view that she hadn't brushed her teeth because of the smell, as well as just things in her teeth, just not brushed in the morning. No socks stands out, and lack of underwear often stands out. I think in her last year there, probably we started you know, giving her sports bras, because she needed a bra at that point[.]"

Holliday testified that she made many attempts to help E with these issues. She said that she gave her a pictorial check list for her to take home and one to leave at school.

Based on her observations of E over the four years that she had her as a student, it was her view that most mornings E "got herself up and got to school the best she could." Holliday was frustrated by E's tardiness; in fact, she bought E an alarm clock, but that did not resolve E's tardiness. She testified that E's absence due to her tardiness and the need to clean her up when she arrived at school interfered with her ability to learn because she missed so much class time. She also said that the other kids gave E a tough time because of her lack of cleanliness, which was not good for E's self-esteem. Holliday said that, during the time that she had E as a student, she contacted mother numerous times and had an ongoing relationship with mother.

Holliday also testified that E needed eyeglasses but often showed up at school without them. There was evidence in the record from an optometrist that E needed glasses and without them "she is moderately visually compromised making normal school activities very difficult." The optometrist said that E had had the eye condition requiring glasses for 13 years. Holliday testified that she spoke to mother about the need for E to have glasses at school. Mother told her that E was showing up at school without glasses because mother could not find them or E could not find them.

Holliday also testified that in December 1999 she made a report to the Department of Human Services (DHS) regarding E in which she said that E had told her that her "pee pee" hurt. While she and the school nurse were investigating that complaint, they observed a four by two inch bruise on E's thigh. Mother later admitted that she had hit E with a piece of kindling to discipline her and acknowledged that this was not appropriate discipline.

Redden, a certified nursing assistant in E's living skills program at high school who had known E since seventh grade, described similar problems. She testified that she spent two and one-half to three hours per day with E. She said that E often smelled of body odor and urine and that other children did not want to be around E because of her smell. She said that, in addition to her clothes being dirty and the frequent lack of underwear, E would wear inappropriate clothing such as a tank top in winter weather or a light jacket

in freezing rain. Staff members who helped her change and wash clothes described her underwear, when she did wear underwear, as "disgusting." E also came to school without any feminine hygiene products during her menstrual period. There was testimony that the staff had to change and wash her bloody underwear and clothes more than once. Redden said that E did not know what the blood was and that Redden had to instruct her to use sanitary pads.

Redden also testified that E needed eyeglasses and that in middle school she "very rarely had them." She said that in high school E was wearing them more often because Boegelsack, her case manager, had her leave her eyeglasses at school in the desk. Redden also said that, since E has been in foster care, that has not been necessary because her foster mother makes sure that she has them with her.

Mother's testimony was quite inconsistent with that of the school officials. She testified that 90 percent of the time she saw E off in the morning and that E was not dirty and was always wearing underwear. Mother said that she believed that E soiled her clothes and body on the way to school and at school. Mother blames the school for many of E's problems and continues to excuse her own failure to deal with the problems by asserting that the school failed to contact her about the problems. Mother testified that she had not had one phone call from the school about E's problems.

We do not find mother's assertions persuasive. There is considerable consistent evidence from various school officials over a fairly extended time period that confirms the condition in which E showed up at school. Further, the evidence establishes that many attempts were made to contact mother and to involve her in working on E's problems and in decisions regarding E. The evidence shows that most often mother did not respond to the attempts to contact her and involve her in the process or that she refused to cooperate in assisting with the resolution of E's problems.

An example of mother's refusal to accept responsibility for the problems that E was having and her unwillingness to cooperate with the school in dealing with E's problems occurred in October 2002. Hanson, a DHS social service specialist, received a referral from the school about possible

neglect of E. E apparently had come to school unclean and complaining of vaginal pain. Hanson first went to E's home and, when no one was there, left a card asking the parents to call her. When they did not, she again went to the home. E's stepfather was at the house. Hanson told him that E came to school smelling of urine and suggested that she should shower and be cleaned up in the morning. He told her that E wet the bed. While at the house, Hanson noticed that the comforter on E's bed smelled of urine. On her next home visit, mother was there. At that time, Hanson told her that E was coming to school smelling of urine. Hanson testified that mother asked what was the law that said that a child could not come to school smelling of urine. When Hanson suggested to mother that E should shower before she came to school, mother yelled at her that E was "retarded" and said that she did not want to shower her in the morning because her hair would be wet. Mother told Hanson that E's accidents were happening at school. Hanson testified that, when she suggested that diapers might be a solution, mother responded by asking if the state was going to pay for those.

Hanson described mother's overall behavior as "[a]ngry, hostile, unreceptive." She said that mother told her a number of times to keep her smart mouth shut and complimented a coworker who was with Hanson for keeping her mouth shut. Hanson followed up at school on mother's assertions that the school needed to give E a shower because the accidents were occurring at school. The school staff told her that E had had only one accident that school year and that accidents at school were not the reason that they were giving her showers at school.

Following her contact with mother, Hanson learned that E was having stomach, crotch, and back pain at school. E apparently had a "severe discharge" with odor. Hanson contacted mother and requested that E be taken to a doctor. Mother responded that whether or not she took E to a doctor was nobody's business but her own. When Hanson told her that it was possibly medical neglect to refuse to take her to the doctor, mother said that, "if you think that's the case, do what you need to do." When E continued to be in pain the next day at school, the school attempted to contact mother

but was unable to do so because the phone numbers that mother had provided were all disconnected.

Hanson also testified that E continued to complain of chronic pain and itching during PE and other activities at school. The evidence shows that E was finally taken to a doctor for this problem shortly after she was placed in foster care in January 2003. The doctor said that the problems were occurring because of poor hygiene. Finally, Hanson explained that the reason that DHS decided to seek dependency jurisdiction in November 2002 was because "the neglect was chronic and our efforts were not resulting in any significant changes and because chronic neglect eventually leads to a deterioration in the child and it was felt it was time to make a change for E's sake."

In addition to risks to E's physical health and well-being, the evidence shows that the conditions and circumstances were such that E's mental development was also put at risk. Because of E's tardiness in arriving at school and the frequent need to clean her up before she went into the classroom, E often missed the first few hours of school. The focus at that time in the school day was on words and reading. E's teachers testified that her absence from this part of school made it hard for her to make any academic progress. It is notable that, when E was placed in foster care in March 2002 when mother voluntarily allowed her to be so placed because she was "out of control," and again when she returned to foster care in January 2003, E did not have problems with tardiness and cleanliness. Redden, the nursing assistant at her school, testified that, after being placed in foster care in January 2003, E came to school clean and had no problems with hygiene. According to her teachers, after being in foster care in January 2003, she began to make academic progress. During that time period, she was able to read for the first time.

An additional factor alleged as a basis for the court to assume jurisdiction is that E is a past victim of sexual abuse and mother discontinued the treatment that was specifically directed at that issue. While E was in foster care in March 2002, she started counseling for sexual abuse victims

with Timms at the Kids' Center, a facility that provides treatment for children with sex abuse issues. She attended six counseling sessions and, according to Timms, was making progress. Shortly after returning to mother's care, however, she went to Arizona for an unknown length of time to live with her father. As a result, the therapy was discontinued; it was not resumed when she returned home to mother. Timms offered mother the opportunity to attend a parents group to learn about the trauma of sex abuse to children and to learn to provide support to such children. Mother never followed up on that opportunity.

Timms testified that it was important for E to continue with the therapy and that it was detrimental to her to discontinue therapy when she did. She said that E needed to learn about personal space and the cycle of abuse so that she could avoid situations where she could be "revictimized." Timms testified that, without therapy, E could have post-traumatic stress disorder, nightmares, difficulties in school, difficulties interacting with peers, and continuing lack of boundaries. Timms said that she talked to mother about the importance of continuing the therapy directed specifically toward victims of sexual abuse. Mother testified that she did not want E to continue at the Kids' Center. In mother's view, E got worse when she attended that counseling. Moreover, mother said that E did not need to go to the Kids' Center because she had E in another counseling program. Mother acknowledged, however, that that program was not directed specifically toward victims of sexual abuse.

The preponderance of the evidence in this record shows that, over an extended period of time, E did not receive the care necessary for her physical, mental, and emotional well-being and that this lack of care, taken together with mother's unwillingness to accept responsibility for most of the deficiencies in care over an extended period of time, subjected E to an unreasonable risk of harm to her welfare. After considering all of the above evidence, we conclude that the state proved by a preponderance of the evidence that mother has failed to provide the care, guidance, and protection necessary for E's physical, mental, and emotional well-being. We find that, based on all of the circumstances here, dependency

jurisdiction by the court is warranted and that the trial court erred in dismissing the petition.

Reversed and remanded with instructions to enter judgment finding that child is within jurisdiction of juvenile court based on allegations in petition paragraph I.