Argued and submitted August 19, reversed and remanded October 26, 2011

In the Matter of
M. R. F., a Child.

DEPARTMENT OF HUMAN SERVICES
and M. R. F,
*Petitioners-Respondents,*

*v.*

D. S. F.,
*Appellant.*

Lane County Circuit Court
07583J;
Petition Number 07583J02;
A148200 (Control)

In the Matter of
S. J. F., a Child.

DEPARTMENT OF HUMAN SERVICES
and S. J. F.,
*Petitioners-Respondents,*

*v.*

D. S. F.,
*Appellant.*

Lane County Circuit Court
07584J;
Petition Number 07584J02;
A148201

266 P3d 116

Mary Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

James A. Palmer argued the cause and filed the brief for respondents M. R. F. and S. J. F.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent Department of Human Services. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

DUNCAN, J.

**DUNCAN, J.**

The juvenile court entered judgments taking jurisdiction over father and mother's children on the ground that the children were endangered by their circumstances. ORS 419B.100(1)(c).[1] One of the bases for the court's judgment was its conclusion that father would endanger the children by allowing them to have contact with mother, who has a long history of substance abuse problems. Father appeals, arguing that the court's conclusion that he would endanger the children is not supported by the record. We agree and, therefore, reverse and remand.[2]

We have the discretion to review this type of case *de novo*. ORS 19.415(3)(b). However, the parties have not requested *de novo* review, and we decline to conduct such a review. *See* ORAP 5.40(8)(c) (we exercise *de novo* review "only in exceptional cases"). Therefore,

> "our task is to review the facts found by the juvenile court to determine whether they are supported by any evidence, and then to determine whether, as a matter of law, those facts together with facts implicitly found by the juvenile court, provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c)."

*Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

Applying that standard of review to the record on appeal, the relevant facts are as follows. Father and mother are married. They have two children, M and S. At the time of the jurisdictional hearing, M was seven and S was four, and they lived with father in the family home in Eugene. Mother was in a residential treatment center in Pendleton.

---

[1] ORS 419B.100(1) provides, in part:

"[T]he juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"* * * * *

"(c) Whose condition or circumstances are such as to endanger the welfare of the person or of others[.]"

[2] Father also appeals the juvenile court's dispositional judgments, which followed the jurisdictional judgments. Because we reverse and remand the jurisdictional judgments, we also reverse and remand the dispositional judgments.

Father has a master's degree in clinical social work. He is employed by South Lane County Mental Health and has worked as a service provider for the Department of Human Services (DHS). Father specializes in grief and loss issues, but he has experience with addiction issues.

Mother has a pattern of abusing drugs and alcohol, seeking and completing treatment, being clean and sober, and then relapsing into drug and alcohol abuse. Mother's substance abuse problems have led to several referrals to DHS.

The DHS petitions that resulted in the jurisdictional judgment at issue in this case were based on the parents' history with DHS. At the jurisdictional hearing, DHS focused on portions of that history, in particular, two incidents that occurred in 2010. With that same focus, we recount portions of the parents' history with DHS and the 2010 incidents in some detail.

In April 2007, DHS petitioned the juvenile court to take jurisdiction over M and S because mother had relapsed while caring for S. The court granted the petition. DHS determined that father was protective of the children and allowed him to keep them with him in the family home. DHS did not require father to complete any services, but it required mother to complete an inpatient substance abuse treatment program, which she did. In June 2009, the juvenile court dismissed its jurisdiction over the children on DHS's motion. At that point, DHS's plan was for mother to live with father and the children in the family home.

Around the time of the dismissal of juvenile court jurisdiction, mother relapsed and returned to inpatient treatment. After completing treatment, she returned to the family home, but she did not provide childcare for the children. Father had the children in school and daycare when he was at work, and he hired a babysitter to care for them when he was unavailable at other times. Father allowed mother to stay in the family home as long as she was not using drugs or alcohol. If she was, he immediately sent her away. It appears that mother was away for extended periods of time.

Father explains mother's absences to the children by telling them that mother "gets sick and goes to the doctor's house." As he testified, he does not "explain to them that [mother] has an incurable and often fatal disease[.] * * * We keep the adult concepts where they belong."

In July 2010, the family went to the Oregon Country Fair, where father worked for the White Bird Clinic, which operates a first aid station at the fair. As is common, the family camped at the fair. One night, mother left the family's campsite and became extremely intoxicated. She went to the first aid station and then to a hospital. The hospital staff could not determine what intoxicants were in mother's system, but advised that she was very ill and needed to be under constant observation until she recovered from her intoxication. The hospital discharged mother, and she returned to the family's campsite, where father stayed awake all night to watch her. Because mother was ill and father was awake, the children did not sleep well.

Around 12:00 p.m. the next afternoon, father took the children to a daycare at the fair. The daycare is available to those who visit and work at the fair. Because the daycare does not provide food and does not have diaper-changing facilities, children are supposed to have been fed before they are left at the daycare, and they are not supposed to be in diapers. Children whose parents are visiting the fair may stay at the daycare for up to two hours; children whose parents are working at the fair may stay longer.

M and S, who were six and three at the time, had been to the daycare before and were familiar with one of the daycare workers, Aarons. Aarons was employed by DHS, but was on vacation to work at the fair. After learning that M and S were hungry and that S was wearing a diaper, Aarons contacted the first aid station to speak with father. Although father was scheduled to work a shift at the first aid station, he was not there. Workers at the first aid station told Aarons that there had been a family emergency and that the children might have to stay at the daycare most of the day. Aarons spoke to S, who reported that mother had been sick most of the night and that father was watching mother and working. The children were concerned about their mother's condition.

At some point during the day, Aarons reported the situation to DHS because, as she testified, she was a "mandatory reporter" and was "concerned about the children being exposed to [mother] in her condition."

Around 3:00 p.m., father came to the daycare and spoke with Aarons. He reported that he was frustrated with the hospital for discharging mother the night before and that he planned to leave the fair with mother and the children. Aarons expressed concern about the children seeing mother while she was ill. After a lengthy conversation, Aarons agreed to accompany father to the first aid station to help him get relieved from his shift and to make arrangements for a first aid station worker to check on mother at the family's campsite. Father agreed to leave mother at the fair and take the children to their babysitter, which he did.

Following the incident at the fair, DHS issued a report in response to Aarons's referral stating that father was aware of mother's substance abuse problems, was protective of the children, and did not allow mother to serve as a care-giver for the children. Specifically, the report states:

"[Father] has demonstrated an ability to keep the children safe from [mother's] drug and alcohol abuse and has a proven history of responding appropriately to keep the children safe. He expresses that he understands the severity of [mother's] issues and is trying to get [mother] the help she needs while keeping the children safe. The family has a plan in place to keep the children safe should [mother] relapse. She is not the caretaker of the children and the children are at school or at child care when [father] works. This has been the case in all contacts this agency has had with the family."

The report reiterates:

"Although [mother] has drug and alcohol issues that impair her ability to safely parent, [father] has historically demonstrated that he is able to protect the children when she relapses. [Mother] leaves the home if she does relapse and must remain out of the home until she recovers. In addition, [father] takes the children to school and/or child care when he is unable to care for the children for any reason. This has been the case historically with this family. During this specific incident that led to this referral,

[father] responded appropriately to protect the children by having them be at child care at the fair versus leaving the children with [mother] during a relapse. [Father] has the willingness and ability to protect the children."

After the fair, mother lived in a number of places: the family home, a rented cottage, her mother's home in Bend, hotels, and the streets. It is not entirely clear when mother lived in each place.

In December 2010, mother returned to Eugene. After she had been in Eugene for a period of time without father's knowledge, mother asked a friend to have father call her at the hotel where she was staying. Father did, and he later went to the hotel, where he found that mother had an abscess on her right buttock from injecting drugs. Father took mother to a clinic for medical care. Mother was placed on a three-day course of strong antibiotics and told to go to a hospital if the abscess did not improve within three days.

The abscess did not improve, and father took mother to a hospital as recommended. Mother was admitted to the hospital, where she received antibiotics and wound care for the abscess. At one point, mother tried to leave the hospital against medical advice. She screamed, became physical with nurses, and pulled out her IV. A doctor and nurse calmed mother down and convinced her to stay for treatment. Mother was in the hospital for five or six days.

Mother's need for continuing wound care made it difficult for the hospital and father to create a satisfactory discharge plan for mother. According to mother's hospital nurse, it would have been difficult for mother "to sustain herself" if released to stay in a hotel. According to mother's hospital social worker, mother "would likely not receive adequate care" if released to a hotel or homeless shelter.

Near the end of mother's hospital stay, father told mother's nurse that he planned to take mother home when she was discharged because he "did not know what else to do." Later that same day, father told mother's hospital social worker that he "didn't really want to take [mother] home, but that it might be his only option." The social worker told father that she or another social worker would explore other options

the next day. Unbeknownst to father and the social worker, mother's nurse had already called DHS because she was concerned that mother might be discharged to the family home and have contact with the children.

The next day, father brought a friend, who is a registered nurse and paramedic, to the hospital to see if the friend could care for mother when she was discharged. Father also met with the social worker, who was trying to secure a nursing-home placement for mother. Father was agreeable to such a placement; he preferred it to taking mother home.

A DHS worker came to the hospital. Father, who was still unaware that mother's nurse had called DHS, was surprised when the DHS worker wanted to speak with him. The DHS worker, who had no prior involvement with father or mother, testified that, when she spoke with father at the hospital, she "tried to explain to him the history of this case and mother's chronic drug and alcohol issues" and told him that, "if the plan was for [mother] to return to the home, given her state, [DHS] would have to make another plan for the children." The DHS worker testified that she "confronted [father] with the lengthy history of [mother] with [DHS]," and, when he responded that DHS had always found him to be protective of the children, she "questioned * * * his ability to protect and set boundaries." She asked where mother had been living and what led father to contact mother at the hotel room. She sought, but could not obtain, mother's hospital records.

Father was upset by the DHS worker's statements and inquiries. His responses were emotional and defensive. He was frustrated that, when he was trying to make plans for mother's discharge and continuing care, the DHS worker was, in his view, insisting that he give her a detailed accounting of where mother had lived in the past year. Father was particularly bothered that, as he saw it, the DHS worker suggested that she would remove his children from his care if he did not provide her with access to privileged information.[3]

_____

[3] Father testified that, if

"[s]omebody comes into a hospital where I am involved in setting up something for a loved one, and starts taking me back chronologically a year and

The DHS worker felt she was "stuck with not knowing what was going on other than the history of [the] case and [the] current situation." She "decided to file a petition in [j]uvenile [c]ourt because [she] couldn't get [father's] cooperation."

The DHS worker filed petitions on behalf of M and S, asking the juvenile court to take jurisdiction over them pursuant to ORS 419B.100(1)(c). As noted above, ORS 419B.100(1)(c) provides that the juvenile court has exclusive jurisdiction over children "whose conditions or circumstances are such as to endanger [their] welfare[.]"[4] Regarding mother, DHS alleged:

> "The mother's use of alcohol and/or controlled substances interferes with her ability to parent in that while under the influence of alcohol and/or controlled substances, the mother has been unable and/or unwilling to provide the child with the care, guidance and protection necessary for the child's physical, mental and emotional well-being. If left untreated, the mother's substance abuse presents a threat of harm to the child."

Regarding father, DHS alleged:

> "The father has failed to protect the child from the threat of harm of neglect in that the father has failed to recognize the threat of harm the mother poses to the child. The father continues to allow the mother to be around the child."

After the petitions were filed, the DHS worker met with M and S. According to the DHS worker, M "indicated that her mother is sick a lot" but M "couldn't really decipher what 'sick' meant, like what her behaviors were like, but [M] * * * knew that her mom was sick."

---

demanding that I give her exact documentation of where everybody was while I'm there to help discharge a loved one and find the care she needs * * * and then all of a sudden * * * they start throwing around words like foster care, removal, placement, extended baby-sitting, * * * [that] kind of bumps me out a little bit."

He further testified, "I don't like having my children used as leverage to get paperwork signed."

[4] DHS filed one petition on behalf of each child. The allegations in the two petitions were the same. The petitions contained allegations in addition to those quoted above, but the juvenile court dismissed them on DHS's motion.

In February 2011, the juvenile court held a hearing on the petitions. Mother stipulated to the allegation against her. Father contested the allegation against him, and the parties presented evidence that established the facts described above. Father and DHS stipulated that mother "was never around the children unsupervised." The DHS worker testified and agreed that the children were "bonded to their father," "well cared for," and "developing fine." But the DHS worker asserted that the children were at risk because they might see mother when she has relapsed and "know that she uses."

At the close of the evidence, DHS acknowledged that it could not prove "actual harm to [the children]." According to DHS, father had "done a pretty good job with [the children]" and they "seem[ed] to be happy [and] pretty well adjusted." But, DHS argued, the children were in a "harmful environment" because mother was "a risk to her children, to the extent that she [could] use and be around them."

In response, father acknowledged mother's long history of substance abuse. He also acknowledged that mother had been in the family home at times. But father pointed out that the stipulated evidence was that he had not allowed mother to have unsupervised contact with the children. He argued that the children's limited, supervised exposure to mother when she was experiencing the effects of her addictions was not a valid basis for jurisdiction, contending that

"[t]here are times when people that are alcoholics and drug users—every day in every facet of our community—are exposed to their children and their children exposed to them, and a sober parent is providing the safety situation so that there isn't a real, you know, actual threat.

"* * * [I]t's a home circumstances theory that the children are being exposed to somebody with such emotional or alcoholic or addictive conduct that it's going to be upsetting to them. And I submit to the court that that's not jurisdictional."

DHS replied that its theory was "not that the children were upset." Instead, DHS explained, its theory was that the juvenile court should take jurisdiction over the children because father might expose them to mother and

mother might harm them. That explanation prompted mother's attorney to point out that there was no evidence that mother had engaged in "any dangerous behavior in the presence of the children."

After hearing the arguments, the juvenile court concluded that DHS had proved by a preponderance of the evidence that father's conduct endangered the children as alleged. The court explained that it was concerned about father's ability to make decisions to protect the children in stressful situations:

> "I think there has been a little bit of a breakdown here in the progression of mother's disease that [father] is able to articulate, I think that when he is not under stress or not confronted with a potentially harmful situation, to make the right call. But the fact is if the mother relapses, and at this point the odds are pretty significant that she is going to continue to relapse, it doesn't take but a moment for a dangerous intoxication or being under the influence of controlled substances to create an actual harm. And that hasn't happened in this case. Although, clearly, the oldest child, who is now seven, is becoming more and more aware."

The court further explained that the oldest child, M, was "starting to size things up." Given its expressed concerns about mother's behavior and M's increasing awareness of mother's condition, the court appears to have been concerned about the risks of both physical and emotional harm to the children. This appeal by father followed.[5]

In accordance with our standard of review, we accept the juvenile court's findings of fact because there is evidence in the record to support them. Thus, the question on appeal is whether those facts provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c).

In order for a juvenile court to take jurisdiction over a child pursuant to ORS 419B.100(1)(c) based on the conduct

---

[5] Mother has not appealed the juvenile court's jurisdictional judgment as it relates to her conduct, and father does not dispute that the court could take jurisdiction over the children based on mother's conduct. His appeal concerns the court's conclusion regarding his conduct, which has a significant practical effect on him because it provides the legal basis for the court to require him to complete services.

of a parent, there must be evidence that the parent's conduct "creates a 'reasonable likelihood of harm to the welfare' of his or her child." *Dept. of Human Services v. A. F.*, 243 Or App 379, 387, 259 P3d 957 (2011) (quoting *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005). "In other words, there must be evidence that the parent's [conduct] gives rise to a current threat of serious loss or injury to the child." *Id.* (citing *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010); *State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 321, 121 P3d 702 (2005)).

Evidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction over a child. *State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009). In order for a court to take jurisdiction over a child based on such exposure, there must be evidence that the exposure puts the child at risk of serious loss or injury. *Id.*

*D. T. C.* is illustrative. In that case, we held that evidence that the father " 'act[ed] out' " and "passed out" after consuming alcohol was insufficient to support juvenile court jurisdiction over his children. *Id.* (brackets in *D. T. C.*). We explained:

> "[W]e perceive little if any evidence that father's condition was harmful to the children in the past. From the record, we learn that he 'act[ed] out' when he drank, that his conduct when drinking frightened the children, and that drinking made him mean and 'controlling.' Obviously, that is not ideal parenting. However, without more, it is not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the parent-child relationship. Passing out is a different matter; had father been the only caregiver in the home when that occurred, we would readily conclude that doing so endangered the welfare of the children. However, at all relevant times, father was living with [his current partner], a nondrinker, and there is no evidence that she was not in the home when father drank himself unconscious."

*Id.* at 554 (second brackets in *D. T. C.*).

In this case, the juvenile court was concerned about potential emotional and physical harm to the children from exposure to mother. But the court's concerns do not justify jurisdiction over the children based on father's conduct because there is insufficient evidence that father's conduct would put the children at risk of serious emotional harm or any risk of physical harm.

First, with regard to emotional harm, the juvenile court was concerned that father would expose the children to mother and, as a result, the children would become aware of mother's substance abuse problems. In concluding that it could take jurisdiction over the children, the court twice referenced the fact that the oldest child, M, was becoming increasingly aware of the nature of mother's problems. But that fact does not provide a basis for juvenile court jurisdiction under ORS 419B.100(1)(c). Awareness of a parent's substance abuse problems does not, in and of itself, give rise to a risk of serious loss or injury. Undoubtedly, mother's substance abuse problems have had, and will continue to have, an effect on father and the children. They miss and worry about her when she is ill and away. Although highly unfortunate, their situation is not uncommon. Many children face the reality of a parent's illness or death, and limited exposure to that reality—as the children here have had and will likely continue to have—does not constitute endangerment for the purposes of ORS 419B.100(1)(c). In this case, as in *D. T. C.*, the children's circumstances are less than ideal, but they "[are] not inherently or necessarily more harmful or dangerous" than other circumstances that "would, by no stretch of the imagination, justify state intervention into the parent-child relationship." 231 Or App at 554.

Moreover, we note that father, who has a master's degree in counseling and specializes in grief and loss issues, has been protective of the children. He has limited their exposure to, and knowledge of, mother's substance abuse problems. He works with the children to process their feelings about mother's illnesses and absences in an age-appropriate way. As he testified, he tells the children that mother is "sick," and he keeps "adult concepts where they belong." His testimony is consistent with that of the DHS worker, who testified that M knows that mother is often "sick," but does not

yet understand what "sick" means in mother's case. There is no evidence that father is failing to help the children process the difficulties in their lives in a manner that has caused, or is likely to cause, serious emotional harm. To the contrary, the undisputed evidence is that, despite their circumstances, the children are happy and well-adjusted.

Second, with regard to physical harm, the juvenile court was apparently concerned that father would expose the children to mother and she would physically harm them. That concern is not supported by the record. Although mother has a history of substance abuse and DHS involvement going back years, there is no evidence that mother has ever been verbally or physically aggressive toward the children. Indeed, there is no evidence that she has ever been verbally or physically aggressive in their presence. There is evidence that when mother wanted to leave the hospital after being admitted for treatment of her abscess, she screamed and became physical with nurses, but that single, situational incident is insufficient to support a conclusion that there is a reasonable likelihood that mother will physically harm the children.

Thus, this case differs from *S. T. S.*, on which the state relies. In *S. T. S.*, the juvenile court took jurisdiction over the parents' children based on the father's repeated verbal and physical abuse of the mother, which had been heard by the older of their two children. The father appealed, and we affirmed, noting that the record included a mental health specialist's testimony that, "when there is physical violence in the home, a child may suffer an inadvertent injury." 236 Or App at 655. In this case, however, there is no comparable evidentiary basis for concluding that it is likely that mother would injure the children.

In sum, we conclude that the juvenile court erred in taking jurisdiction over the children based on father's conduct because there was insufficient evidence that his conduct was reasonably likely to harm the welfare of the children.[6]

Reversed and remanded.

---

[6] Father also appeals the dispositional judgment in this case. ORS 419B.325. Because we conclude that the juvenile court erred in exercising jurisdiction, we also reverse that judgment.