Submitted September 1, affirmed November 18, 2020

In the Matter of E. G. P.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

V. G.-C.,
*Appellant.*

Marion County Circuit Court
19JU04746;
A173830 (Control)

In the Matter of A. G. P.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

V. G.-C.,
*Appellant.*

Marion County Circuit Court
19JU04747; A173837

476 P3d 1275

Mother appeals a consolidated juvenile dependency case that joined a petition to assert jurisdiction filed by the Department of Human Services (DHS) and a petition for guardianship filed by grandmother. The juvenile court denied grandmother's guardianship petition and ruled that the children were within its dependency jurisdiction. Mother's appeal primarily focuses on grandmother's availability as a family resource to care for the children such that juvenile jurisdiction would be unwarranted. Specifically, mother asserts that DHS did not carry its burden to prove that the children would be endangered in grandmother's care. Mother argues that under *Dept. of Human Services v. A. L.*, 268 Or App 391, 342 P3d 174 (2015), evidence of grandmother's possible role in mother and father's drug trafficking was not sufficient to prove that the children would be exposed to a risk of serious loss or injury that was likely to be realized if the court dismissed the petition. *Held*: The trial court did not err because, given the facts, there was a "reasonable likelihood" of harm to the welfare of the children.

Affirmed.

Audrey J. Broyles, Judge.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Elena Stross, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Julia Glick, Assistant Attorney General, filed the brief for respondent.

Before Lagesen, Presiding Judge, and James, Judge, and Kamins, Judge.

JAMES, J.

Affirmed.

**JAMES, J.**

This is an appeal from a consolidated juvenile dependency case that joined a petition to assert jurisdiction filed by the Department of Human Services (DHS), and a petition for guardianship filed by grandmother. Mother appeals from the judgment exercising two jurisdictional bases over her children, raising six assignments of error that primarily focus on grandmother's availability as a family resource to care for the children such that juvenile jurisdiction was unwarranted. Specifically, mother asserts that DHS did not carry its burden to prove that the children would be endangered in grandmother's care.[1] We affirm.

The parties have not requested that we exercise our discretion to review *de novo*, ORS 19.415(3)(b), and this is not an exceptional case in which *de novo* review would be appropriate. *See* ORAP 5.40(8)(c) (we review *de novo* "only in exceptional cases"). Accordingly, in reviewing the juvenile court's judgment, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We are bound by the juvenile court's explicit and implied findings of historical fact, if any evidence in the record supports them. *Id.* at 639-40. We recount those facts at length below.

This case concerns mother's sons, E, born in 2009, and A, born in 2016. Mother and father became the subject of a long-term coordinated state and federal investigation for organized criminal activity. After conducting several large controlled buys of narcotics, the investigation established probable cause sufficient to obtain warrants to search mother and father's apartment, and grandmother's house, which, officers believed, was being used as a "stash house for bulk cash." In executing that search warrant, officers discovered $115,000 in cash in grandmother's dishwasher and

---

[1] As framed in this case, the jurisdictional question is dispositive on the consolidated issue of grandmother's guardianship petition. Accordingly, the parties focus their arguments on the jurisdictional issue, and our opinion in turn focuses solely on the jurisdictional issue.

another $10,000 to $20,000 elsewhere in the house. Notably, officers did not ask grandmother about the cash in her dishwasher, nor was she arrested or charged with any crimes, although they later stated that they had suspected she was involved. Police also suspected that other family members were involved in the crimes, but, unlike grandmother, police arrested and charged several of them.

Shortly after father's arrest, he posted bail; law enforcement has not located him since. Mother was indicted on five felony charges: unlawful delivery of heroin, unlawful delivery of cocaine, unlawful possession of cocaine, and two counts of child neglect in the first degree. Mother entered conditional guilty pleas to one count of unlawful delivery of cocaine and one count of child neglect in the first degree. In doing so, she admitted to delivering at least 10 grams of cocaine and to knowingly allowing E to stay on the premises and in the immediate proximity where drugs were criminally delivered or manufactured for consideration and profit. Mother was sentenced to five years of supervised probation.

Following that investigation and the parents' arrests, E and A were removed from the parents' care. A was just a few months old at the time. DHS placed the children with their current foster mother, a relative, for about one year and four months. In February 2017, the children were returned to mother's care. Under the terms of mother's probation, mother and the children lived with grandmother, who provided childcare every afternoon.

In June 2018, without informing mother's probation officer, mother and the children began living with mother's new boyfriend, who officers believed was also involved in drug-related organized crime. Subsequently, police began surveilling the movements of mother, her new boyfriend, and grandmother as related to the new investigation. During surveillance operations, Officer Zuniga of the Salem Police Department noticed that mother and her boyfriend's pattern of travel between several locations was similar to the pattern that officers had discovered in the 2016 investigation. That pattern of travel, they noted, was common for people who participated in organized drug crimes because it facilitated separate locations for drugs, money, and safety. Zuniga also

noted that mother's regular visits to grandmother's house before going to the parole and probation office indicated that mother may have been attempting to conceal her true home with her boyfriend from any possible surveillance. Zuniga also suspected that grandmother was involved in the crimes because she "had previously held money, drug proceeds for many organizations," and was often seen "coming and going [from her house], entering with no bag, walking out with a bag."

In May 2019, police identified mother's new boyfriend as a "source of supply" for drugs in Salem, and he was arrested carrying more than two pounds of methamphetamine and a half-pound of heroin. Two days later, grandmother paid the boyfriend's $50,000 bail, over $25,000 of it with cash, and the remaining on two credit cards.

A month later, police received information that the boyfriend was planning to jump bail and flee from the charges against him. Accordingly, officers continued surveilling the boyfriend's, mother's, and grandmother's movements. On one particular occasion, Zuniga observed grandmother leave mother and the boyfriend's house with a small paper bag, which led Zuniga to believe that, based on the totality of the circumstances, "there was possibly illegal cash inside the bag." Grandmother returned to the house about 30 to 60 minutes later and parked "over a half a block away" from where she had parked earlier, despite ample parking space directly in front of the house, which Zuniga thought was strange. As grandmother approached the house, the boyfriend emerged, carrying luggage.

Zuniga approached the two and noticed that in addition to his luggage, the boyfriend was carrying a bus ticket to California. Grandmother permitted Zuniga to look in a bag located in her vehicle that looked like the paper bag that she had been carrying earlier. Inside was $1,400 in cash from grandmother's business, along with receipts. Zuniga believed that the boyfriend was going to travel to California and grandmother was going to give him the cash and a ride to the bus station. Grandmother explained that she was planning to use the money to pay two bills, which she could corroborate with supporting documents. Although

grandmother gave the bag to police to conduct a drug test on it, the results of that test are unknown. Grandmother was never charged with any crime, and police did not seize her money.

Grandmother initially denied knowing the boyfriend when asked by police. In response, the officer asked her: "If you don't know who [boyfriend] is, why would you bail him out of jail for $50,000? [Grandmother] said that she had done it for a favor to some other person." Eventually, grandmother acknowledged that she knew him. Grandmother then assisted Zuniga to convince the boyfriend to allow the police to search his house for "drugs and other drug trafficking activities." When police searched the house, they found the children in a bedroom. Police discovered three grams of heroin in a drawer next to the bed, which was accessible to the children. Police also found $3,000 in cash and ledgers recording kilogram amounts of heroin and methamphetamine and dollar prices consistent with those amounts.

Grandmother denied "any involvement in drug trafficking activities." Zuniga noted that although the children were "terrified" during the search, grandmother helped "make sure the kids were okay," and she remained to do so even though she was free to leave until the DHS workers arrived at the house and took the children to be placed in foster care.

The boyfriend was arrested on federal charges and is awaiting deportation proceedings. Mother's probation was revoked, and in a stipulated facts trial in October 2019, she was convicted of four felonies: unlawful delivery of heroin, unlawful possession of heroin, and two counts of child neglect in the first degree. Mother was sentenced to five years in prison and three years of post-prison supervision.

DHS petitioned for jurisdiction for both children on the following grounds:

"A.   The child's mother exposed the child to controlled substances, and persons and activity related to the distribution of controlled substances, placing the child at risk of harm.

"B.   The child's mother is incarcerated, and therefore she is unavailable as a custodial resource.

"C.    The child's father has a warrant issued for his arrest in case 16CR27970, and until that warrant is cleared, he is unavailable as a custodial resource for the child.

"D.    The child's father's whereabouts are unknown, and therefore he is unavailable as a custodial resource.

"E.    The child's grandmother, and temporary guardian, is aware of, and failed to prevent, the child's exposure to the child's mother's controlled substance possession and distribution, and exposure to other persons engaging in that activity, placing the child at risk of harm."

Shortly after DHS placed the children in foster care, grandmother, whose 17-year-old daughter lived with her, moved to be appointed as the children's guardian in a probate guardianship action, which mother supported. In accordance with that plan, E would go to school during the day while grandmother worked, and the foster care provider would provide daycare services for A. That plan would allow the children to stay in their current schools. Grandmother had also ensured that additional childcare would be available if required. Grandmother was willing to be the children's guardian until they reached adulthood and to prevent parents from contacting them if grandmother thought it was not appropriate.

Five days before the dependency jurisdiction hearing, DHS filed a motion to amend its petition, to delete allegation E., which was the only jurisdictional allegation pertaining to grandmother. The court granted the motion.

On March 16, 2020, the juvenile court held a dependency hearing regarding the four remaining jurisdictional allegations and to address grandmother's petition for guardianship of the children. Zuniga testified extensively about the investigations and experiences with grandmother, noting that he was not concerned about her involvement in drug activity, but was concerned that her house was a safe house for money:

"[GRANDMOTHER'S COUNSEL]:  Do you have concern that right now [grandmother] is involved in ongoing drug activity?

"[ZUNIGA]:  My concerns are not that specifically.

"*****

"THE COURT:　What are your concerns with Grandma right now?

"[ZUNIGA]:　As part of my experience again with organized crime we see the same people involved in the organization. If somebody gets arrested, another member of the organization, normally a family member or close friend kind of take over that detail or that job in the organization. [Grandmother's] job was not that of a drug trafficker.

"It was more of a safe house for the money. That was back in 2016. And a significant amount of money. [Mother's] actions did not change. [Mother's] actions were to continue with the organization, maybe a slightly different organization, yet the same pattern, the same—the same controlled substances. ***.

"*****

"And based on my experience a lot of inconsistencies were starting to show the fact that they were the same thing all over again."

On cross-examination by the children's attorney, Zuniga testified that he believed that during both the 2016 and 2019 investigations, E and A were placed at risk of harm because of drug trafficking:

"[CHILDREN'S COUNSEL]:　In 2015 and '16 and then again in 2019 do you believe that these two children, [A and E] were placed at risk of harm because of this drug trafficking?

"*****

"[ZUNIGA]:　Yes.

"[CHILDREN'S COUNSEL]:　And in both of those drug trafficking events [grandmother] was involved in as part of the drug trafficking organization in your opinion.

"[ZUNIGA]:　Yes."

Zuniga also testified that he was concerned that, because mother and her boyfriend spoke on a monitored jail cell telephone line about asking grandmother to coordinate attorney assistance, that grandmother had continued

ties to the activities in the ongoing drug trafficking investigation:

> "[MOTHER'S COUNSEL]: Okay. Do you have any information tying [grandmother] currently to either one of those two investigations at an ongoing basis?
>
> "[ZUNIGA]: I believe so, yes.
>
> "[MOTHER'S COUNSEL]: What's your ongoing ties with the information you have?
>
> "[ZUNIGA]: There were jail phone call conversations between [mother] and with the subject whom I recognized to be [her boyfriend]. Those conversations occurred while [mother] was in custody. And in part of their conversations they were referencing [the boyfriend] reaching out to [grandmother] and in attempts to contact attorneys and kind of working through some of these situations that are kind of sitting in here right now."

The children's foster mother also testified during the hearing, through the use of an interpreter. She recounted one particular occasion in which E expressed that he wanted to be wealthy:

> "[FOSTER MOTHER]: We were—the child is always saying he wants to be rich and he wants to have a lot of money. He's always talking about those things. So I told him that it's okay to be rich but we have to find better ways of accumulating rich and wealth.
>
> "* * * * *
>
> "[FOSTER MOTHER]: And I asked him if they had a plan to get rich. And obviously they said no. So I told him that we can make him piñatas. That would be a way to make a little bit of money. So after that, that was it. But I saw him and he started putting sugar in bags because he said he wanted to have money now.
>
> "[CHILDREN'S COUNSEL]: Okay. And did he tell you that he was going to be selling those bags?
>
> "[FOSTER MOTHER]: Yes, he said he was going to go sell them." The foster mother also noted that the older child has also mentioned that "when he was with his parents, his parents used to send him to his room when they were cooking something that he shouldn't smell. But still he could smell it and it smelled really bad in his room."

In its closing arguments, DHS argued that the court should rule that the children were within its dependency jurisdiction because mother and father were "unavailable," and that grandmother was "not a suitable resource for the children given her involvement in all the criminal activity." Mother argued that, under *Dept. of Human Services v. A. L.*, 268 Or App 391, 342 P3d 174 (2015), evidence of grandmother's potential role in mother and father's drug trafficking was not sufficient to prove that the children would be exposed to a risk of serious loss or injury that was likely to be realized if the court dismissed the petition. Grandmother, who was present on her consolidated probate guardianship case, argued that mother's "delegation of parental rights" to grandmother did "not rise to the current threat of serious loss or injury" to the children.

At the conclusion of the hearing, the juvenile court noted that this was a "close case," but ultimately denied grandmother's guardianship petition and ruled that E and A were within its dependency jurisdiction on the following bases:

> "A.   The child's mother exposed the child to controlled substances, and persons and activity related to the distribution of controlled substances, placing the child at risk of harm.
>
> "B.   The child's mother is incarcerated, and therefore she is unavailable as a custodial resource."

The court reasoned that mother's repeated involvement with drug trafficking occurred over a "protracted length of time," and was a "long-concerted effort of family in an organized drug realm," which distinguished this case from the *A. L.* case. The court also noted that the investigation into grandmother's involvement was ongoing, and that it was "unusual" that she had provided transportation for the boyfriend to flee from his pending charges. Additionally, the court was particularly concerned with grandmother's refusal to acknowledge any involvement in criminal activity:

> "No, she absolutely denies any responsibility, any knowledge of this organized drug trafficking. So Grandma is not abusive to the children in the sense of physical harm. But the harm that I see that is even greater is that she is

inculcating these children or if she were their guardian, allowing them to be inculcated into a criminal organization that their father is engaged in and is still awaiting resolution on."

On appeal, mother raises six assignments of error, arguing that the juvenile court erred in exercising jurisdiction over the children and denying grandmother's proposed guardianship. Specifically, mother contends that DHS's evidence regarding grandmother was too stale and too speculative to meet its burden to prove a cognizable risk of harm. DHS responds that the juvenile court had sufficient evidence to exercise jurisdiction.

The "key inquiry in determining whether condition[s] or circumstances warrant jurisdiction is whether, under the totality of circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks omitted). DHS must show that the risk of harm is present at the time of the hearing and not merely speculative. *Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012) (citing *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011)). DHS has the burden to demonstrate a nexus between the allegedly risk-causing conduct and the harm to the child. *Dept. of Human Services v. D. S. F.*, 246 Or App 302, 314, 266 P3d 116 (2011) ("Evidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction over a child[;] *** there must be evidence that the exposure puts the child at risk of serious loss or injury.").

Mother does not dispute that the facts regarding her drug use, criminal activity, and incarceration would support jurisdiction over the children if she were the only caretaking resource. However, in this case, because mother proposed to entrust the care of the children to grandmother, the question is whether—even with DHS having proved parental deficits—the evidence in the record, as a whole, established that the totality of the children's circumstances or conditions in the care of grandmother exposed them to

a current risk of serious loss or injury that was reasonably likely to be realized.

Both at trial, and on appeal, mother relies primarily on our decision in *A. L.* There, we considered several pieces of evidence concerning the grandparents, including their "indictment for financial participation in a marijuana grow operation; (2) evidence that drug houses have a higher risk of robbery \* \* \*; (3) the 10-year-old founded disposition of physical abuse by the paternal grandfather; and (4) the paternal grandparents' violation of the safety plan." 268 Or App at 398. As to the grandparent's implication in criminal activity, we noted that fact "without more, is not sufficient to show a current and nonspeculative risk of harm to the children." *Id.* However, in making that statement we noted that "a search of the paternal grandparents' home did not reveal any evidence of criminal activity that would create a risk of harm to the children; rather, the only evidence presented was speculative." *Id.* at 398-99.

At trial mother argued that *A. L.* prevented DHS from even introducing evidence of the money found in grandmother's home because she had not been the target of the criminal investigation. On appeal, mother argues that *A. L.* compels reversal because "the department presented no evidence that grandmother had ever been indicted for any crime, much less even investigated. Additionally, the record does not reflect that, after 2016, the police ever even attempted to obtain a warrant—much less had the probable cause to get one—to search grandmother's home." Mother misconstrues the import of *A. L.*

There are no specific facts that *per se* do or do not give rise to dependency jurisdiction. *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993). The test is one of totality, and DHS is not limited to evidence that meets the standards of criminal prosecution. Whatever the reasons for the state not seeking to criminally investigate or charge grandmother in mother's drug operation, that choice does not render the facts surrounding grandmother inappropriate for consideration by the juvenile court.

At the outset, we agree with the juvenile court that this is a close case. Close cases, such as this, are not license

for us to supplant the reasoned conclusions of the juvenile court with our view of the facts. We do not try the case anew, but are constrained by our standard of review, viewing the evidence and inferences "in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *N. P.*, 257 Or App at 639.

Here, the first fact we note is that, in conducting an investigation of mother for drug trafficking, police located over $100,000.00 in grandmother's dishwasher. Grandmother testified that she did not know how that money came to be located in her home, and the juvenile court was well within its discretion to discredit that testimony. Second, grandmother paid bail for mother's boyfriend in over $25,000 in cash, and further funds on her credit cards. When confronted by law enforcement she denied any knowledge of the boyfriend. As one officer testified, "I asked her, 'If you don't know who he is, why would you bail him out of jail for $50,000?' She said that she had done it for a favor to some other person." Like it did with the testimony concerning the money in the dishwasher, the juvenile court was within its discretion to discredit grandmother's denials.

Certainly, those two facts here did not *compel* the juvenile court to conclude that grandmother was implicated in mother's criminal enterprise and that her care of the children would expose them to a current risk of serious loss or injury. But, equally, it was not *foreclosed* from reaching that conclusion. Under our standard of review, we cannot conclude that those facts, viewed in the light most favorable to the court's ruling, and viewed in the totality of the additional evidence of mother's and boyfriend's ongoing criminal activity, was legally insufficient. Although arguably the facts surrounding grandmother may not rise to the level of criminal probable cause, that is not the benchmark. Rather, they need only give rise to a *nonspeculative* risk of harm to the children.

In this case, there was evidence that, as a result of a family-run drug enterprise, the children had been directly exposed to drugs and drug manufacturing, including smelling the odor of drugs being made in their home, and that

grandmother had been, and would continue to be, involved in that enterprise to some degree. That was not the case in *A. L.*, where "DHS could not identify any harm caused to [the children] in living with the paternal grandparents. Instead, the record demonstrates that they were well-adjusted and happy children before their removal and, indeed, that the greatest harm they suffered was from the removal itself." 268 Or App at 400. The facts here are sufficient to cross the line from speculation into legally sufficient "reasonable likelihood" of harm to the welfare of the children. *C. Z.*, 236 Or App at 440.

Affirmed.